N. J. ROUSE v. CITY OF KINSTON.

(Filed 21 June, 1924.)

1. **Trespass—Damages—Condemnation—Municipal Corporations—Cities and Towns—Statutes—Waiver.**

Where a city is sued for damages for running its water-supply pipe on the plaintiff's lands, and it is made to appear that the pipe land is upon the State's highway over the plaintiff's land, the plaintiff, as the dominant owner, may maintain his action, and the denial of this title or right by defendant is a waiver of its right that the plaintiff should have proceeded before the clerk under the statute (C. S., ch. 33) entitled Eminent Domain, sec. 1706; and the plaintiff may maintain his action of trespass in the Superior Court.

2. **Water—Subterranean and Percolating Waters—Damages—Evidence.**

Where a city has dug artesian wells to supply its inhabitants with water, for pay, adjoining or adjacent to the plaintiff's land, causing the water from his artesian wells thereon to be so greatly diminished in volume or flow that it rendered the lands unproductive and deprived him or his tenants of wholesome drinking water, etc., to the impairment of their health, and greatly depreciated the value of the lands, the measure of damages is not confined to the present use of the lands, and the jury may consider any and all the purposes to which the property was reasonably adapted and might with reasonable probability be applied, and award to plaintiff the difference between the fair market price of the lands before and after the defendant's unlawful act.

3. **Same—Instructions—Appeal and Error.**

Where a city has unlawfully taken the pure water supply for its inhabitants, from an adjacent or adjoining owner of lands, to the injury of his property, by the boring of artesian wells: *Held*, evidence of pre-

1—188

vious negotiations between the parties looking towards a financial adjust-
ment of the plaintiff's damages, which had never been consummated, is
not reversible error, when the trial judge has instructed the jury they
could only consider it as fixing the defendant city with notice that dam-
ages would follow to the plaintiff from the boring of the defendant's
artesian wells.

**4. Same—Reasonable Use.**

The owner of lands is only entitled to the reasonable use of percolating
waters collected in subterranean channels on his own lands; and where
a city has dug artesian wells for the water supply of its inhabitants, so
as to practically exhaust the supply to the artesian wells of an adjoining
owner, to the injury of the productiveness of his lands and the health of
his tenants, it is responsible in damages to the plaintiff for the injury to
his lands thereby caused; and the English common-law doctrine to the
contrary is inapplicable under our statute, C. S., 970.

STACY, J., dissenting.

CIVIL ACTION, heard before *Grady, J.,* and a jury, at November Term,
1923, of LENOIR. Appeal by defendant.

The material facts are:

The plaintiff, N. J. Rouse, was a resident of Kinston since 1883, and
a native of Lenoir County. In 1914 he bought what is known as the
"Caswell Lodge Plantation," about 2 miles west of Kinston, on the
State Central Highway, No. 10, containing 581 acres—approximately
300 acres of wood and timber land that is in low ground, subject to
overflow, and about 281 acres of cleared land. The "Gin House" tract
was purchased later, and contained about 18 acres.

It was in evidence that when the plaintiff purchased the plantation it
was in a complete state of dilapidation and had the appearance of a
farm being neglected and practically going to waste; no sign of paint;
no buildings on it, except the main building; a few old barns, with roofs
practically off; two or three little tobacco barns and tenant houses that
had gone to decay. The water that was available was from open wells,
and the water was poor, repellant, unhealthy, not drinkable.

Dr. W. T. Parrott testified: "The health conditions prevailing on the
Caswell Lodge place up to the time Mr. Rouse bought it, I would say,
were as bad as the health conditions in the Mississippi bottom. It had
a bad reputation—the way the land ran—in a slope—and the drainage
from the hills above. It had shallow wells. It was worse than a per-
fectly flat place. All the organic waste from the hills would naturally
filter there. I saw the place after Mr. Rouse had dug these wells. I
have practiced medicine on the plaintiff's plantation, both before and
after he bought it, and as far as practice on that farm was concerned,
the deep wells practically put me out of business. . . . Beginning in

1903 or 1904, the general health of the community has increased won-
derfully.    I recall the health conditions in this vicinity in 1902.
Typhoid fever is communicable through the drinking water, but such
things as malarial chills come from another source—surface conditions
bring that about.  In the last twenty-three years the ideas of the gen-
eral public and the profession as to community health problems has
undergone a complete change.    The surface drainage of this place as
well as others similarly situated has removed the malarial conditions
by removing the mosquito that caused it."

The health conditions were bad.  Could not get any drinking water
on the place, could smell it when it was gotten out of the wells.  The
water was muddy.  The people who lived on the place were sickly and
many died.  In wet seasons the water looked like stagnant water from
pools.  Scum collected on it.

For farming, it was practically abandoned; very little farming done
on it.  White or negro tenants would not live on it.  It was good land;
the trouble was the water.

D. F. Wooten, ex-sheriff of the county and president of the First
National Bank of Kinston, who had 17 years experience in farm opera-
tion, and who owned half of the land for ten or twelve years, testified
that the farm was unhealthy and the water not there for domestic
purposes.

This was the condition of the plantation when the plaintiff bought
it.  The plaintiff was mayor of Kinston.  The first artesian well dug
in Kinston was at the corner of the old pumping station.  It was dis-
covered 8 August, 1904, and that well discharged between 30 and 40
gallons natural flow.  The plaintiff testified: "My first experience with
artesian wells was when I was mayor.  That well was dug at the direc-
tion of Dr. Tull and myself.  He was chairman of the board of county
commissioners and it was an experiment, and when that water came
up, that water ascended the pipes 7 or 8 feet."  With the experience
that the plaintiff had in that locality, artesian wells were the only ones
that would furnish pure and wholesome water fit for domestic purposes.
He said: "I began to explore for deep wells promptly after I got it.
I saw it was impossible to get tenants; the first objection was that there
was no water and was unhealthy, and I determined to try and get deep
water.  .  .  .  It is good land, all of it.  The lightest soil that you
can find on the plantation that is good for agricultural purposes going
towards LaGrange.  In between the highway and the railroad down
to this end it is just a little lighter than the balance, and going west
it is a good clay subsoil.  Cultivate excellent crops on it regularly—
tobacco, corn, rye, oats, any crop that grows in this section, and it is
all adequate to trucking.  I knew when I bought the place that it was

necessary to drive an artesian well, which I did. When I bought that place I did not own the gin premises mentioned here. I bought the gin premises and there was a well there sunk by a former owner and was running feebly, furnished sufficient water for the tenants until these wells were put down. The first thing I did was to condemn the open well at the northern end of the porch of the main building and had this well sunk there at the back porch and brought from the back porch and entered into this basin, and it produced as fine water as any we have; the well was not as good a well as the second one. It was a good well and good water, and abundant. The water went to a depth of 200 feet, and we piped the water to a reservoir on the back porch; used it for several years on the back porch. I had two lines piped to the well. One line I took off to the dairy, which is about twenty feet north of the back porch. I took a pipe and conducted it to the dairy and had a sink made for butter and milk, and this water ran into the sink in which the butter and milk was kept, and the water was flowing continuously, didn't have to do any pumping; then, after going into the dairy, we had it so arranged that it went into the horse lot about thirty feet east of the dairy. The water was running through the trough all the time and went through the public road to the highway and watered my cattle; my cow stables are south of the road. The water from the horse lot emptied into another trough, and escaping from that it emptied into these marl holes, and was carried across the public road into the two houses that are there now. These were tenant houses. From that well I ran pipes into the tenant houses and furnished them from the same well without any artificial pressure. There were two pipes; one went to the residences and one went into the dairy. Then a third pipe went in a northwest direction through my garden. The low ground could have been irrigated. I put down plant first; it began to sog my garden; irrigated it too much. This is the only well at the house. On the other side of this plantation some houses are scattered here and there, and I took those two residences, two houses painted red that lie west of the highway, built those houses, and I sunk a well midway between the houses to furnish them both with water. That well was carried down a depth of 200 feet, lined it all the way down, and out of that well came the largest flow of artesian water I have ever seen. I have had experience as to artesian wells. I was mayor when it was discovered that we could get artesian wells here. It was freer than the city wells. This well furnished a good deal more water than either of the city wells. We put a tap on it and reduced it; it was coming so strong you could not catch it with a dipper, and a system of piping was installed and water taken into the residence further west, occupied by J. D. Stevens. That water flowed with great volume through his kitchen

into the sink and went through both houses. It was 150 yards between the two houses and the well was between the two; 75 yards each one was to the well. Both were dependent upon that well. Including the labor, the piping and help incident to exploration and digging of these wells, my best estimate would be that they cost about a thousand dollars for the two. It might be a few hundred dollars either way. Things were cheaper then. That is not including the piping around the residence; I am speaking about the wells alone. In addition to that, the cost of pipes to the different residences I would say that added $150 or $200 to it; I expect $200. I did not keep an account of it. The uses of this stream of water made the plantation desirable to live upon; in the first place, supplied as good water as is in the world, with the result that it is a healthy plantation. It enabled me to get an entirely satisfactory class of tenants. I can get as many tenants as I want, because it is healthy and good water. It has made it particularly desirable for a dairy. I built a silo and got me a herd of cattle. The low land is elegantly adapted for pasture land, and with the water it makes it ideal for a dairy. Another purpose, it is entirely adaptable to irrigation. The large well on the highway, which I estimate to be running 75 to 100 gallons a minute, was brought up four or five feet above the ground, which made it then in its location about twelve feet above the level of the cleared land. Immediately I saw an ideal situation for irrigation. It could have easily been carried over the land for irrigation with a hydraulic ram or small motor; it was entirely practicable and sufficient water furnished to have pumped it into a reservoir that would have supplied a row of houses along my entire front along the highway. In addition to that, there was enough water there and the location was such, its elevation, with little expense to have installed various kinds of machinery. It was adaptable to a mill for doing the usual and necessary grinding that a plantation needs to have done. . . . I would say that a moderate estimate of that land, located as it is with fertile soil, improved as I had improved it. I had marled the plantation practically all over. I had cleared quite a lot of land north of the railroad that had been cut down for fifty years and never cultivated. I had kept cattle all these years, ranging from a herd of fifteen to thirty-five. I have planted it in rye and have the land now in good fertile condition. I think the market value of that land would be moderately placed at from $150 to $175 an acre through. There are five hundred and eighty-one acres, and $87,000 would be a conservative estimate of land at that time. . . . Q. 'What was the condition after the supply of water had been diminished?' A. The possibilities of the place in respect to irrigation are gone and no water that you can get from the pump. I think that place without deep

water would become a waste plantation again. But for the timber on it, and as an agricultural proposition, I would not undertake to pay the taxes, if deprived of deep water. That plantation has not only State and county taxes, but is in the city of Kinston school district. I would say that certainly without deep water the Caswell Lodge plantation is not worth half of its value that it had with it. After the deep-well water is eliminated, it would not be worth half price. With the city water supply, I would say that the value had been diminished from twenty-five to thirty-three and a third per cent."

Since purchasing the plantation, and his success in securing deep artesian water, the plaintiff had placed improvements on the plantation of from fifteen to twenty thousand dollars, and had brought the same from a condition of practically waste land to a desirable farm and to a high state of cultivation.

The city purchased from R. F. Hill, the adjacent owner to the western boundary of plaintiff's land a half acre of land at a cost of $250. Soon after purchasing said lot of land from R. F. Hill the city began the sinking of deep wells thereon, and expressed its purpose to conduct water therefrom through a ten-inch main into the city of Kinston, and in May, 1922, began at the city limits to prepare for laying pipes from the city along the Central Highway to its auxiliary pumping station on the plot of land purchased from R. F. Hill, the half-acre plot purchased from R. F. Hill, adjoining the plaintiff's western boundary, and was some several hundred yards west from plaintiff's highway well.

The plaintiff had certain negotiations with the city trying to arrive at an adjustment. The city laid its main across the plaintiff's land and along the highway, plaintiff having fee-simple title to same, pending the negotiations, but no agreement was reached.

It was contended by plaintiff that the gin-house well of the plaintiff and the main dwelling-house well of the plaintiff, both concurrently with the sinking of the defendant's wells and transporting water therefrom to the city, ceased to flow, and neither well since said time to the present furnishes any water whatever to the plaintiff's premises; and at those locations left plaintiff without any available water supply that can be used, and there is none available except from the city's mains. The highway well was reduced to an amount at present inadequate to supply the tenant residence as theretofore supplied, the flow from said well still gradually diminishing.

An overflow artesian well of R. F. Hill, a short distance west of the city's well, likewise discontinued its flow contemporaneously with the opening of the city's wells, the wells of the city being ten-inch wells, three in number. The complete cessation of the flow of two of plaintiff's wells and the diminution of the flow of the third from about 75

to 100 gallons a minute to 8 gallons per minute,·and the entire cessation of the flow of R. F. Hill's well were contemporaneous with the opening of the city's ten-inch wells, and cessation of the flow of the city's wells while in construction by sanding or by capping the same caused the water to return in plaintiff's wells and in the well of R. F. Hill in former volume, to be followed immediately by cessation again when the flow from the city's wells was again released.

It was testified to by different witnesses that the market value of the land was from $30,000 to $150,000, and after the city had sunk its deep-water wells and the plaintiff's wells had dried up, the market value had decreased from 15 to 50 per cent.

The defendant contends:

"That the city found it necessary, in order to meet the demands of its inhabitants for water for sanitary purposes and for fire protection, to increase the number of its artesian wells, and in 1922 it sank three artesian wells on a small tract of land which it purchased from one Hill, lying immediately west of plaintiff's Caswell Lodge Farm, and immediately south of the Central Highway. Pursuant to what the plaintiff and the city thought would result in an amicable adjustment, and pending these efforts, each party expecting a final settlement by agreement, the city laid its water mains across plaintiff's property and began to pump water from its reservoir, supplied by its three artesian wells, across plaintiff's land."

The efforts to reach an amicable adjustment failed. The plaintiff instituted this action.

The defendant answered and set up its right to condemn, in order to supply its inhabitants with water, a right of way across plaintiff's lands pursuant to an ordinance duly passed by it so condemning such right of way, and asked in its answer that condemnation proceed, commissioners be appointed, and in due course that it be determined what, if any, damage the plaintiff had suffered at the hands of the defendant city.

The case came on for trial; the court below, over the defendant's objection, tried the case as a common-law trespass on the part of the city. Evidence was introduced on behalf of the plaintiff, tracing the condition of·the plaintiff's farm as far back as his witnesses could remember, especially with reference to the water conditions, the healthfulness of the occupants of the said farm, its rundown condition, all of these conditions increasing in severity until the plaintiff purchased the land a good many years ago; then evidence was introduced to show that the value had gradually increased under plaintiff's management and expenditures until he sank artesian wells on it, and then, with reference to its increasing desirability for tenants, agricultural, dairy,

residential and industrial uses, etc., and asserting against the defendant that when it sank its three wells on its own land that it thereby deprived the plaintiff's farm of a chief element of value, to wit, its artesian water, by causing its artesian wells to diminish in flow, and some of them to dry up, and that the plaintiff suffered damages in the laying of the water main, some two thousand feet in length, across his land, practically all of this distance, except two hundred feet, being within the Central Highway, by consent of the State Highway Commission. The defendant contended that it had a right to condemn its right of way and have the damages assessed by a jury, and that the plaintiff was not damaged materially in any respect, and that whatever damages he might have suffered was more than offset by the benefits accruing to said farm in having the city water main across it, with full privileges of use of the city water at the same rates as inhabitants of the city, without the attendant burden of city taxes and restrictions, and that said water main was so far below the surface as not to interfere with any reasonable use of plaintiff's property, and supported this with evidence.

Defendant further contended, and there was evidence to support this contention, that the value of plaintiff's farm had increased on account of being connected with the city water system in a material amount, and was worth more after the city sank its wells and put in operation its water mains, and that while in fact the sinking of said wells on its own land did not interfere with the flow of plaintiff's wells, and that there was no physical relation between plaintiff's wells and the city wells, that as a matter of right the city had the full and free right and power to sink wells on its own land as it did, and to take therefrom all the water that might naturally rise from such wells into its reservoir, and that then it had a full and perfect right, and that it was its duty, to transport the said water into its water system for its inhabitants in order that their health and sanitary conditions should be promoted, and that fire protection should thereby be afforded, and that such was not an invasion of the plaintiff's property rights with respect to his said farm, and created no liability on the part of the defendant for the use of its said wells and the water flowing therefrom.

It appears distinctly and plainly in all the evidence offered by the plaintiff and the defendant that the water in controversy flows naturally and without the application of artificial force from the defendant's wells into its reservoir, and that no pumping or other means is used to extract the water from said wells, although electricity is used to pump said water, after it has flowed naturally into the reservoir, from said reservoir into the main and into the city water system.

ROUSE *v.* KINSTON.

The following judgment was rendered in the court below, on the issues submitted:

"This action coming on for trial before his Honor, Henry A. Grady, judge, and a jury, upon the issues submitted, the said issues and the answers of the jury thereto being as follows:

"1. Did the defendant sink artesian wells on its own lands, adjacent to the lands of the plaintiff, and thereby wrongfully and unlawfully withdraw waters from the lands of the plaintiff in such quantities as to diminish and retard the flow of waters from the artesian wells of the plaintiff as alleged in the complaint? A. Yes.

"2. If so, what damages is the plaintiff entitled to recover by reason of such unlawful act? A. $8,000.

"3. Did the defendant wrongfully and unlawfully enter upon the lands of the plaintiff and place water mains thereon as alleged in the complaint? A. Yes.

"4. If so, what damages is the plaintiff entitled to recover by reason of such unlawful act? A. $1,000.

"It is now, on motion, considered, ordered and adjudged that the plaintiff, N. J. Rouse, do recover of the defendant, the city of Kinston, the sum of $9,000 (nine thousand dollars), with interest thereon from 5 November, 1923, until paid at 6 per cent per annum; and further, that the plaintiff do recover of the defendant the costs of this action, to be taxed by the clerk.

"It is further considered, ordered and adjudged that, in consideration of the amount assessed as damages by the jury in response to the fourth issue, that the defendant, city of Kinston, be and is hereby adjudged entitled to and that it has an easement over and across the lands of the plaintiff for its water main as at present laid and constructed, extending from its auxiliary water station adjacent to and west of plaintiff's lands to the eastern boundary of plaintiff's lands, that is the eastern boundary of plaintiff's gin-house tract described in the complaint, with the right to enter upon said strip of land on which said water main is constructed, and in which it is imbedded for the purpose of maintaining and repairing the same, and for such necessary purposes as are incident to the use of said water mains as a part of the water system of the defendant, said easement to continue so long as the defendant shall use and maintain the said water main as a part of the water system of the defendant. And this judgment shall have the full force and effect of giving and assuring unto the defendant a permanent easement or right to maintain its lines and wires and poles across the defendant's lands as the same are now constructed and to construct them otherwise as they are at present located for the purpose in connection with its water plant.

"And it. is further ordered, adjudged and decreed that the defendant shall have, under this judgment and in this action, the full right and power and authority to continue and to operate its wells at its pumping station as it may desire according to law in view of the recovery against it herein."

The defendant excepted to the judgment as signed in favor of plaintiff, assigned error, and appealed to the Supreme Court. On the trial 144 exceptions were taken. There are 53 assignments of error and grouping of exceptions by defendant, which material ones we will consider in the opinion.

*George Rountree, Robert H. Rouse, and Cowper, Whitaker & Allen for plaintiff.*

*Jno. G. Dawson, F. E. Wallace, L. R. Varser, Dickson McLean, and H. E. Stacy for defendant.*

CLARKSON, J. The defendant's first assignment of error:

"The defendant moved the court to remand the case to the clerk, to the end that commissioners might be appointed as in condemnation proceedings, based on defendant's answer, or to appoint the commissioners to view the premises and assess the damages, which the court declined to do."

C. S., ch. 33, "Eminent Domain," sec. 1706, is as follows:

"The right of eminent domain may, under the provisions of this chapter, be exercised for the purpose of constructing their roads, canals, lines of wires, or other works, which are authorized by law and which involve a public use or benefit, by the bodies politic, corporations, or persons following: . . .

"Section 2. Municipalities operating water systems and sewer systems and all water companies operating under charter from the State or license from municipalities, which may maintain public water supplies, for the purpose of acquiring and maintaining such supplies."

We said in *Parks v. Comrs.,* 186 N. C., 498: "Where the owner of land seeks to recover damages for the injury resulting from the location of a railroad on his land, he must pursue the remedy prescribed by the charter of the railroad company, as this statutory provision takes away by implication the common-law remedy by action of trespass on the case." *McIntire v. R. R.,* 67 N. C., 278. See *S. v. Lyle,* 100 N. C., 503; *R. R. v. McCaskill,* 94 N. C., 746; *Allen v. R. R.,* 102 N. C., 381. Where the Legislature has prescribed a method of procedure the statute on the subject must ordinarily be followed. *Proctor v. Comrs.,* 182 N. C., 59. *Jones v. Comrs.,* 130 N. C., 452; *Dargan v. R. R.,* 131 N. C., 623; *Durham v. Rigsbee,* 141 N. C., 128; *Luther v. Comrs.,* 164 N. C., 241; *Pharr v. Comrs.,* 165 N. C., 523; *Shute v. Monroe,* 187 N. C. 683.

In the present case the defendant denies the right of plaintiff to recover damage for the pipe line running along the State Highway No. 10, plaintiff having a fee-simple title to the land. In *Teeter v. Tel. Co.,* 172 N. C., 785, it is said: "It is not denied by defendant that the telegraph line superimposed upon a railroad right of way is an additional burden which entitled the owner to compensation. *Hodges v. Tel. Co.,* 133 N. C., 225; *Phillips v. Tel. Co.,* 130 N. C., 513." To the same effect is a water main. Defendant also denies the right of plaintiff to recover damages for the diversion of the percolating and flowing water in and under the lands of plaintiff.

C. S., 1716, is as follows:

"For the purpose of acquiring such title the corporation, or the owner of the land sought to be condemned, may present a petition to the clerk of the Superior Court of the county in which the real estate described in the petition is situated, praying for the appointment of commissioners of appraisal."

Under the above section, the condemnation proceedings is "For the purpose of acquiring 'such title,' " etc. The defendant denies that the plaintiff has a title that can be condemned except a short distance of the pipe line over his land. The defendant contended that the State Highway Commission had given the plaintiff the right to the use of the land for the underground water mains along its right of way. The plaintiff had the fee-simple title in the land.

We think the principle in *Keener v. Asheville,* 177 N. C., 4, applicable. It is there said: "In this view, the present case, we think, comes clearly within the recent decision of *Mason v. Durham,* 175 N. C., 638. There the county commissioners, in straightening a public road, had taken a strip of plaintiff's land. In an action to recover damages, defendants denied plaintiff's ownership of the land and, generally, his right of action, and on the hearing resisted recovery for the reason, among others, that plaintiff's remedy was in petition to the board of commissioners, as the statute provided, and it was held, among other things: 'The county board of commissioners, in acting upon a petition by the injured owner whose land had been taken for road purposes, under a statute providing for the assessment of damages by this method, does so in an administrative capacity; and where the board has taken and is using the land for such purposes, *and the owner has not followed the special method provided and brings his action in the Superior Court for his damages, the defendant's denial of plaintiff's ownership and its liability for the damages waives its right to insist that the statutory method should have been pursued by the plaintiff.'* " (Italics ours.) *Fleming v. Congleton,* 177 N. C., 186. The defendant denies plaintiff's

ownership to reasonable use of the percolating water and damages for pipe line along highway, the fee simple belonging to plaintiff.

This assignment cannot be sustained.

Defendant's second assignment of error:

"The court erred in admitting evidence offered by the plaintiff tending to show the condition of the plaintiff's farm from the time of the alleged trespass and injury until some fifty or sixty years prior thereto, including in this evidence statements as to health conditions on said farm and vicinity, complaints of tenants on account of water and as to health conditions, . . . and including agricultural conditions on the farms and ancient methods of farming, etc., . . . and did not confine these to the time of the alleged injury." (The part of this assignment left out we do not think material.)

In *Power Co. v. Power Co.,* 186 N. C., 183, *Stacy, J.,* lays down the measure of compensation, as follows: "It is the accepted position here and elsewhere that in condemnation proceedings, where property is taken for public use, or a *quasi*-public use, under the power of eminent domain, the measure of compensation to be awarded the owner is the fair market value, taking into consideration any and all uses or purposes to which the property is reasonably adapted and might, with reasonable probability, be applied. The test is the fair market value of the property. 10 R. C. L., 128; Nichols on Eminent Domain (2 ed.), sec. 445; *Brown v. Power Co.,* 140 N. C., 333; *R. R. v. McLean,* 158 N. C., 498; *Land Co. v. Traction Co.,* 162 N. C., 503. In *Boom Co. v. Patterson,* 98 U. S., 403, the rule is very clearly stated by *Mr. Justice Field,* as follows: 'In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted—that is to say, what is it worth from its availability for valuable uses? Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it and make it subserve the necessities or conveniences of life. Its capacity of being made thus available gives it a market value which can be readily estimated.' To like effect are the decisions of this Court in *R. R. v. Mfg. Co.,* 169 N. C., 156; *R. R. v. Armfield,* 167 N. C., 464; *Teeter v. Telegraph Co.,* 172 N. C., 784."

In *Creighton v. Water Comrs.,* 143 N. C., 172, the witness was asked the character of meadow land before a dam was erected and water backed on such land. The answer was: "I have been working with it

about thirty years, and it was certainly good meadow—just as fine as anybody's meadow in the country."

The witness further gave the value of hay gotten from the land from year to year, although he said he had never weighed it but got four to six to eight two-horse loads.

*Mr. Justice Hoke* says: "This testimony was offered and admitted to show the character and quality of the land appropriated, and was clearly competent."

In *Myers v. Charlotte,* 146 N. C., 248, *Chief Justice Clark,* for a unanimous Court, says: "The value of land is largely a matter of opinion derived from a variety of circumstances," and proceeds to illustrate his holding.

The court below, on this aspect of the case, charged the jury as follows: "I charge you that the measure of damages in respect to this second issue, in case you should answer the first issue 'yes,' is the difference in value between the land in question immediately prior to the digging of plaintiff's wells and immediately subsequent thereto. That is to say, you will ascertain from this evidence the true market value of the land in question immediately before such wells were sunk, and you will then ascertain the true market value immediately after the wells were sunk. You will then deduct the latter figure from the first, and the remainder will be your answer to the second issue."

We think the charge in accordance with the law of this State. The evidence bearing on the question of compensation naturally takes a wide range—the surrounding circumstances and facts. From the record both sides were allowed latitude, and we can find no fact of prejudicial or reversible error.

*In re Drainage District,* 162 N. C., 129, it was said: "The other, that the court instructed the jury to take into consideration the health of the community instead of confining them to the question of health in so far as it affected the lands within the drainage district, cannot be sustained, for the court charged that the jury should consider 'not only the increased facilities of the land for producing crops, but the benefit to the health of the people who live in the district.'"

In *Snell v. Chatham,* 150 N. C., 736, *Clark, C. J.,* said: "It is an old saying that 'fragments of all the sciences are taken up in ashes of the law.' It is not long since that our progressive brethren of the medical profession have discovered that one kind of mosquito (anopheles) causes malaria; that another (stegomyia) carries yellow fever, and another still spreads the Asiatic cholera; that house flies spread typhoid fever, that fleas on rats communicate the dreaded Bubonic plague, and lesser germs, as bacteria and bacilli, are the agents of other diseases. For thus do 'the weak things of the world confound the things which

are mighty.' . 1 Cor. 27. Acting on these discoveries, under authority of law the stegomyia and yellow fever have been extirpated in Cuba and the Bubonic plague was stayed in San Francisco because mosquitoes and rats were systematically destroyed by the officers of the law. There is no reason that the plaintiff's home shall not be freed of malaria by authority of a judgment based upon medical advice, especially as the parties agreed that such remedy (whatever the majority of the medical arbitrators should find it to be) should be entered as the judgment of the court."

That stagnant water, in light of present-day medical opinion, is obnoxious to health in this country, chiefly as it serves for a breeding place for certain species of malaria-carrying mosquito, the only means at present known by which that disease is disseminated. The life and habitat of the mosquito has received the most careful investigation at the hands of the United States health authorities. Vol. 23, 17 July, 1908, of the Public Health Report of the United States Marine Hospital Service.

The benefit to the health of the people who lived on the plantation is more important than the increased facilities of the land for producing crops, and it is clearly competent in fixing the market value of the land to show before and after the artesian wells were sunk the condition of the health of the inhabitants who lived on the land. Good health can more easily create wealth. It gives strength and vigor to work.

This assignment cannot be sustained.

Defendant's assignment of errors 3 and 52:

"The court erred in admitting evidence as to conversations between the plaintiff and board of aldermen and in permitting the introduction of plaintiff's written proposal which was never accepted by the defendant, and in denying the defendant the privilege of showing that the plaintiff did agree for the defendant to cross his land pending the negotiation looking toward an adjustment by consent and in charging the jury that they might consider written proposals and evidence of efforts between the parties to adjust the matters as evidence of notice that the sinking of the wells and laying off the water mains would result in damage to plaintiff."

The court below charged the jury: "In conclusion, I desire to call your attention to the fact that during the progress of this trial a controversy arose about the introduction of certain evidence as to a contract between plaintiff and the defendant city of Kinston, a copy of the proposed contract having been offered in evidence. I charge you that there never has been any contract between the city of Kinston and the plaintiff, Mr. Rouse. . . . It was never accepted by the city and never completed nor executed. This evidence in respect to the contract

and to the dealings between Mr. Rouse and the city of Kinston, including the proposal and his rejection, was offered for the sole purpose of showing, if it does show, that the city of Kinston had notice at the time of the sinking of the wells and the laying of the water main that such act would necessarily cause the plaintiff damages, and that is the only purpose for which this evidence was offered, and you cannot consider it in any other light."

We think if error was committed it was not prejudicial. The court's positive instruction, "You cannot consider it in any other light," was all the defendant could ask.

These assignments cannot be sustained.

Assignment of error No. 4:

"The court erred in admitting evidence as to possible future uses and developments of plaintiff's farm, based on the supposed continued flow of plaintiff's private artesian wells, such as residential, industrial, and commercial uses, admitting opinions as to these and that such developments were impossible with city water, but were possible only with water from private artesian wells. Also that rates for outside water users would be raised or discontinued in the near future, including a letter that outside water rates had been raised since this controversy, and with this injecting private opinion as to value as distinguished from market value, allowing witness to say 'would not give one-half for it.'" We have already discussed the rule of compensation.

We think the defendant has no reason to complain. The defendant's witnesses went into this matter in every phase. For example, S. L. Lynch testified: "I own a piece of land on the edge of town between Kinston and the Caswell Lodge plantation of Mr. Rouse. I was raised on a farm, and am still a little interested in farming. I have been seeing the Caswell Lodge plantation for 25 or 30 years. Never been all over it, only riding the different roads to go by. I just about know the boundaries on the west of Mr. Hill and east of the Watford land. I think thirty or thirty-five thousand dollars would have been a good price for the farm in May, 1922, before the city sank its wells and laid its pipe line there. I think forty thousand dollars or more would be the value of the place after the deep wells were sunk by the city and the water connection made with Kinston across the land. In my opinion connecting the water supply of the city across the land increased the value of the land; it increased mine and I think it did theirs."

This assignment cannot be sustained.

Assignments of error Nos. 9 and 10:

"The court erred in refusing to submit the issue framed by defendant as to unlawful diversion of water from the plaintiff's land and damages flowing therefrom, and in submitting the issue in the following form:

'Did the defendant sink upon its own land, adjacent to the plaintiff's land, artesian wells of such strength and force as to unlawfully interfere with and absorb the underground percolating waters under the lands of the plaintiff, and thereby diminish, retard or destroy the flow of waters from the plaintiff's wells, as alleged in the complaint?' and in submitting an issue of damages designating such interference as an unlawful act."

Assignments of error Nos. 13, 14, etc.:

"These assignments of error present the question as to the correctness of his Honor's view that the English rule of absolute ownership of land did not cover the absolute right to use underground percolating waters not contained in any well-defined underground stream according to the owner's desire, but that such use was limited to the rule applied in some of the American courts and known as the 'reasonable user' rule, limiting the owner the use of such percolating waters on the premises which contained the wells. The various phases of the application of the trial court's view are presented in the several exceptions noted in this group of assignments of error."

The above assignments of error set forth the main contention in this case. The "reasonable user" of underground percolating water. The issue was drawn and the contest waged over the doctrine of "reasonable use" of percolating water. The authorities are conflicting. We are of the opinion that the reasonable use doctrine is supported by the greater weight of authorities in the United States and is the just and equitable rule to follow.

In 27 R. C. L., sec. 91, it is said, in part: "The law respecting the rights of property owners in percolating subterranean waters is of comparatively recent development. The first English decision dealing with underground waters was rendered in 1840, and the case which has become recognized as the leading one on the subject was decided in 1843. According to the doctrine laid down by this and subsequent decisions, and known as the common-law rule, or English rule, water which percolates through the soil without any definite channel is regarded as much a part of the freehold through which it courses as the clays, sand, gravel and rocks found therein, and the owner, at least in the absence of malice, has the absolute right to intercept the water before it leaves his premises and make whatever use of it he pleases, regardless of the effect that such use may have on a lower proprietor through whose land the water, in its natural course, was wont to filtrate and percolate. This rule was followed in nearly all of the early and in a number of the later American cases, in the absence of express contract and of positive authorized legislation, *but the trend of modern opinion in this country is toward the 'reasonable use' rule.*" (Italics ours.)

C. S., 970, is as follows: "All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State." This law was passed in 1778, ch. 5, and from an examination is practically the exact language as C. S., 970.

The English decision referred to in R. C. L., *supra,* is *Acton v. Blendell* (1843), 12 Mees. & W., 324; 13 L. J. Exch., held that a landowner has no such right or interest in a subterranean water course as to enable him to maintain an action against a landowner who, in carrying on mining operations upon his own land in the usual manner, drains away the water from the land of the first-mentioned owner and lays his well dry. This decision might well have been based upon the doctrine of reasonable use, but it was rested upon the absolute ownership on the part of the mine owner of all that lay beneath the surface of his land.

We do not think the English rule laid down in 1843 applicable and consonant or consistent with the just ideals of our Government. It is persuasive but not binding on this Court. *Meeker v. East Orange,* 77 N. J. L., 623 (1909), is a similar case as the instant one. The authorities are there carefully and thoroughly reviewed by *Pitney,* Chancellor (afterwards on the Supreme Court Bench of U. S.). He said, for a unanimous Court: "Upon the whole we are convinced, not only that the authority of the English cases are greatly weakened by the trend of modern decisions in this country, but that the reasoning upon which the doctrine of 'reasonable user' rests is better supported upon general principles of law and more in consonance with natural justice and equity. We therefore adopt the latter doctrine. This does not prevent the proper use by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation or otherwise, nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted. But it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land when they are taken, if it results therefrom that the owner of the adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agricultural, pasturage or other legitimate uses."

2—188

In *Westphal v. City of N. Y.,* 69 N. E., 369; 177 N. Y., 143, it was held: "The defendant, to supply a public need of its citizens, established the driven wells and pumping stations upon its own property; but the effect of their operation has been to withdraw, or to abstract, waters from the surrounding lands, to the injury of the plaintiffs. This was a natural effect and, as a consequential injury, there has been an invasion of the plaintiff's property rights, which constituted a technical trespass, for the resultant damages of which a right of action accrued."

In *Midway Irrigation Co. v. Snake Creek Mining and Tel. Co.,* 271 Fed. Rep., 162, it was held: "The rule generally adopted by not only the courts of the arid States, but by most of the American courts, so that it may be said to be the American, as distinguished from the English rule, is that, while the owner of the land is entitled to appropriate subterranean or other waters accumulating on his land, which thereby becomes a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if such use in excess of the reasonable and beneficial use is injurious to others, who have substantial rights to the water. *Meeker v. City of East Orange,* 77 N. J. Law, 623; 74 Atl., 379; 25 L. R. A. (N. S.), 465; 134 Am. St. Rep., 798; *Smith v. Brooklyn,* 18 App. Div., 340; 46 N. Y. Supp., 141, affirmed 160 N. Y., 359; 54 N. E., 787; 45 L. R. A., 664; *Forbell v. New York,* 164 N. Y., 522; 58 N. E., 644; 51 L. R. A., 695; 79 Am. St. Rep., 666; *Bassett v. Salisbury,* 43 N. H., 569; 82 Am. Dec., 179; *Willis v. Perry,* 92 Iowa, 297; 60 N. W., 727; 26 L. R. A., 124; *Stillwater Co. v. Farmer,* 89 Minn., 58; 93 N. W., 907; 60 L. R. A., 875; 99 Am. St. Rep., 541."

In *Erickson v. Crookston Waterworks P. and L. Co.,* 100 Minn., 481, it was held:

"The law of correlative rights applies to the use by adjoining landowners of waters drawn from an artesian basin. Such proprietors must so use their wells as to not unreasonably injure their neighbors.

"The circumstances of a particular case may render it illegal for such landowner to make merchandise of such supply in a particular manner.

"A water company acquired title to lands on which were wells flowing from an underground basin, the source of supply of a hundred or more similar wells on lands of adjoining owners in the natural use of the soil. It is held that the water company had no right to deprive them, or any of them, of water by use of artificial force in pumping the water in the artesian basin to a low level, in order that it might supply a neighboring community with water as merchandise."

In *Horne v. Utah Oil Refining Co.,* 59 Utah Rep., 279 (1921), *Thurman, J.,* has gone into a most exhaustive discussion of the entire subject,

and it was held in that case that "The owner of land is entitled only to a reasonable use of the percolating waters under his land for purposes connected with the beneficial ownership or enjoyment of his own land; and for the use of such water by an owner to be a 'reasonable use,' especially in an artesian district, it should be limited first to his just proportion according to his surface area; and second, he should not be entitled even to this quantity to the injury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water; and the owner has no right to injure his neighbors by an unreasonable diversion of the water for the purpose of sale or carriage to distant lands."

The *Horne case* was affirmed in a decision by the same judge in *Glover v. Utah Oil Refining Co.* (1923), 218 Pac. Rep., 955.

This matter is also discussed at length by *Temple, J.,* in the famous case of *Katz v. Walkinshaw,* 141 Cal., 116; 64 L. R. A., 236. Sustaining the doctrine of reasonable use, he says: "But this question was completely put at rest, so far as the State of New York is concerned, by the case of *Forbell v. New York,* 164 N. Y., 522; 51 L. R. A., 695; 79 Am. St. Rep., 666; 58 N. E., 644. It was a suit by another plaintiff to restrain the same operations considered in *Smith v. Brooklyn.* Here there was no visible stream or pond on plaintiff's land. His injury was merely that the level of the water held in the soil was lowered, to his injury. In stating the case the Court said: 'The defendant (city) makes merchandise of the large quantity of water which it draws from the wells that it has sunk upon its two acres of land. The plaintiff does not complain that any surface stream or pond or body of water upon his land is thereby affected, but does complain, and the courts below have found, that the defendant exhausts his land of its accustomed and natural supply of underground or subsurface water, and thus prevents him from growing upon it the crops to which the land was and is peculiarly adapted, or destroys such crops after they are grown or partly grown.' This statement shows a striking similarity of the issues made in that case to those involved here. The court proceeds to state the usual doctrine in regard to percolating water, and approves the doctrine for the cases in which it is properly applicable. No doubt the land proprietor owns the water which is parcel of his land, and may use it as he pleases, regard being had to the rights of others. It is not unreasonable that he should dig wells in order to have the fullest enjoyment and usefulness of his estate, or for pleasure, trade, or whatever else the land as land may serve. 'But to fit it up with wells and pumps of such pervasive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region there about, and lead it to his own land, and by merchandising it prevent its return,

is, however reasonable it may appear to the defendants and its cus-
tomers, unreasonable as to the plaintiff and the others, whose lands are
thus clandestinely sapped, and their value impaired.' "

The *Walkinshaw case* was affirmed after a rehearing, *Shaw, J.* (64
L. R. A., 250), said: "It is clear, also, that the difficulties arising from
the scarcity of water in this country are by no means ended but, on the
contrary, are probably just beginning. The application of the rule
contended for by the defendant will tend to aggravate these difficulties
rather than to solve them. Traced to its true foundation, the rule is
simply this, 'That, owing to the difficulties the courts will meet in secur-
ing persons from the infliction of great wrong and injustice by the
diversion of percolating water if any property right in such water is
recognized, the task must be abandoned as impossible, and those who
have valuable property acquired by and dependent on the use of such
water must be left to their own resources to secure protection for their
property from the attacks of their more powerful neighbors, and failing
in this, must suffer irretrievable loss; that might is the only protection.

'The good old rule
Sufficeth them, the simple plan,
That they should take who have the power,
And they should keep who can.'

"The field is open for exploitation to every man who covets the pos-
session of another, or the water which sustains and preserves them,
and he is at liberty to take that water if he has the means to do so, and
no law will prevent or interfere with him, or preserve his victim from
the attack. The difficulties to be encountered must be insurmountable
to justify the adoption or continuance of a rule which brings about
such consequences."

The facts in the *Walkinshaw case, supra,* were: "The action was
brought to enjoin defendant from drawing off and diverting water from
an artesian belt, which is in part on or under the premises of plaintiffs,
and to the water of which they have sunk wells, thereby causing the
water to rise and flow upon the premises of plaintiffs, and which they
aver had constantly so flowed for twenty years before the wrong com-
plained of was committed by defendant. The water is necessary for
domestic purposes and for irrigating the lands of plaintiffs, upon which
there are growing trees, vines, shrubbery, and other plants, which are
of great value to plaintiffs. All of said plants will perish, and plaintiffs
will be greatly and irreparably injured if the defendant is allowed to
divert the water. These facts are admitted, and further, that defendant
is diverting the water for sale, to be used on lands of others distant
from the saturated belt from which the artesian water is derived."

Mr. Weil in his work on Water Rights in the Western States, Vol. 2 (3 ed.), in secs. 1039 and 1040, briefly defines and discusses the "English Rule," both as to percolating water and water courses, and carefully makes the distinction. In section 1041 the "American Rule" is referred to as a modification of the English rule, and reference is made to list of cases from 18 American jurisdictions where the English rule "has been either expressly departed from or doubted in one form or another." The cases are cited in the note to section 1066, and are from the following States: California, Colorado, Delaware, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, New York, West Virginia, and also from the United States Supreme Court.

The *contra* view is held in many states. In Ohio and Pennsylvania the courts have ruled that where the subterranean supply of water is stopped by the lawful act of an adjoining landowner, the resulting injury is *damnum absque injuria.* See *Appeal by Lybe,* 106 Pa., 626, 51 Am. Rep., 542; *Frazier v. Brown,* 12 Ohio St., 294; *Elster v. City of Springfield,* 49 Ohio St., 82, 30 N. E., 274.

To the same effect are the cases of *Hunte v. Laramie,* 181 Pac., 137 (a Wyoming case); *Henninger v. McGinnis,* 108 S. E., 671 (a Virginia case decided in September, 1921); *Huber v. Merkel,* 117 Wis., 355; *Chatifield v. Wilson,* 28 Vt., 49; *Houston & Texas Central Railroad Co. v. East,* 98 Tex. Rep., 146; *Chase v. Silverstone,* 62 Maine, 175.

An interesting discussion of "Reasonable use of percolating water in the West" is to be found in Harvard Law Review, March, 1924, p. 602 (Vol. 37, No. 5), *et seq.*

The facts in the instant case succinctly are: The plaintiff purchased 581 acres of land in 1914—281 acres cleared land and balance bottom land. The cleared land was good for all kinds of farming, trucking, dairying, etc.; considerable frontage of his land was on the State Central Highway No. 10, that could be utilized for homes. The land was about two miles from the thriving city of Kinston. When purchased, the houses on the land had become almost worthless and in decay. The farm land had gone to waste; impossible to get white or colored people to live in the houses, or farm the land, on account of the bad surface water in shallow wells that the tenants had to drink. The place was sickly; no tenants could be obtained, on account of bad water—surface wells. The plaintiff had had experience—one of the promoters of the idea of artesian wells for water in that section of the State. He had found from experience that from the deep artesian wells could be obtained clear, pure and wholesome water, fit for domestic purposes, for man and beast. He sunk artesian wells, at a considerable cost, and obtained a splendid supply of pure and wholesome water, fit for domes-

tic use. One well on the highway was estimated to run 75 to 100 gallons per minute, and the flow was reduced to 8 gallons a minute after the city wells were sunk. The water made the land adaptable for irrigation. He rebuilt the Caswell Lodge, or Red House, and built numerous tenant houses. He put artesian water in them. He built barns, ran a dairy, built a silo, got a herd of cattle, and was able, on account of the good and wholesome water, to get the most efficient tenants and all he needed. He painted the houses, improved the land and brought it up to a high state of cultivation, and it became a very valuable plantation, producing fine crops. He spent large sums of money to do this.

From the testimony of witnesses, after the artesian wells were dug he made of a desert place an oasis.

"And the desert shall rejoice and blossom as a rose."

In 1922 the city of Kinston, a thriving, up-to-date, modern city, was in need of more water to meet the demand of an increasing population. It needed pure and wholesome water for domestic purposes, drinking, sanitary, and fire protection. It was known to the officials of Kinston that the deep artesian wells on the plaintiff's plantation had produced pure and wholesome water. It was no experiment, no useless digging by the city, at large cost, to hunt the subsurface, percolating water. It was found by plaintiff on his plantation in a large quantity. The city of Kinston was unable, for causes not clear in the record, to buy or condemn, as they had the right to do, and pay just compensation for the subsurface percolating water on plaintiff's land. They purchased a half-acre of land for $250.00 from an adjoining landowner, established an auxiliary water station, and sunk artesian wells—three 10 inches in diameter, one 158 feet deep, another 178, and another 608 feet deep. The wells are about 75 feet apart and several hundred yards from plaintiff's wells. The water from these wells comes from its own force into the reservoir; it is then pumped into the city mains from the reservoir, and sold to the dwellers in Kinston, and used for drinking and sanitary purposes, fire protection, etc. Since the city sunk its wells, the plaintiff's wells have gradually diminished and have practically dried up, and it has left plaintiff without any available water supply that can be used, except what is available from the city's mains. The Highway well is so reduced to an amount inadequate to supply the tenant residence near it. The cessation of the flow in plaintiff's wells was cotemporaneous with the city's sinking the three 10-inch wells. As a result, plaintiff's wells are practically worthless and dry. That on account of the city of Kinston taking the water, the farm is returning to its former dilapidated condition, and its value has been

materially decreased. It is difficult for plaintiff now to get tenants. His dairy has been destroyed.

Under the English rule promulgated in 1843 (*Acton v. Blundell, supra*), plaintiff would have no cause of action, under the facts in this case. Taking the subterranean or percolating water by the defendant would be *damnum absque injuria*. It is contended by defendant that the rule applies of *cujus est solum, ejus est usque as cœlum et ad inferos.* To whomsoever the soil belongs, he owns also to the sky and to the depths. This is a maxim of the common law. This principle allows the landowner to take soil, rock, or anything he desires from the land. He can build the Tower of Babel, "whose top may reach unto Heaven," and he can go to the center of the earth, and all above and below belongs to him. But this rule is limited by another well-known doctrine or maxim of the common law, *"Sic utere tuo ut alienum non lœdas."* So use your own as not to injure another's property.

Water is a fluid, mobile, unstable. "Unstable as water, thou shall not excel." The human body is composed of 70 per cent water. We find in Dalton's Human Physiology (7 ed.), p. 36: "According to the best calculations, water constitutes in the human subject about 70 per cent of the entire bodily weight. . . . In accordance with the results formerly obtained by Barral—that, for a healthy adult man, the average quantity of water introduced into the system is about 2,000 grammes per day." It is necessary to sustain human life. It is needful in agriculture and industry. Percolating water being mobile and unstable, and being so important to health, agriculture and industry, we think the "reasonable-use" doctrine is correct in principle. Such an important factor in the human body, and useful for other purposes, should not be monopolized, as under the English rule, but the American rule of reason should prevail.

Law is considered the perfection of reason and founded on justice and common sense. It would be contrary to the administration of justice and right to construe the law, in a case of this kind, which would work injustice and wrong, to be that the plaintiff had no remedy. The defendant realized that this percolating water, in law and morals, could not be taken and sold as a commodity to the injury and detriment of plaintiff, without just compensation. In its answer it says, "and it has continuously been ready, able and willing to negotiate with the plaintiff as to a money compensation."

We think the American rule, adopted in most of the States where this question has arisen, the "reasonable use" of percolating water, the correct rule. The beauty of the common law is that it is elastic and at all times fitted to meet modern life and changing conditions when consonant with right and justice. We think there is no error in the charge

of the court below, as follows: "This rule does not prevent the private use by any landowner of percolating waters subjacent to his soil, in manufacturing, agriculture, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining, or the like, although by such use the underground percolating waters of his neighbor may be thus interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale, for uses not connected with any beneficial ownership or enjoyment of the land from which they are taken, if it thereby follows that the owner of adjacent lands is interfered with in his right to the reasonable use of subsurface water upon his own land, or if his wells, springs or streams are thereby materially diminished in flow or his land rendered less valuable for agriculture, pasturage, or for legitimate uses. . . . I therefore charge you that, in the absence of contract or legislative enactment, whatever is reasonable for the owner to do with his subsurface water, he may do. He may make the most of it that he reasonably can. It is not unreasonable for him to dig wells and take therefrom all of the waters that he needs in order to get the fullest enjoyment and usefulness from his land, for the purposes of abode, productiveness of the soil, or manufacture, or whatever else the land is capable of. He may consume it at will; but, to fit it up with wells and pumps of such pervasive and potential reach that from their base he can tap the waters stored in the lands of others, and thus lead them to his own land, and by merchandising it, prevent its return, to the injury of adjoining landowners, is an unreasonable use of the soil, and in such event the injured neighbor may bring his action for damages."

In *Smith v. Morganton,* 187 N. C., p. 802, it was said: "The doctrine finds support in our decisions which hold that a riparian proprietor is entitled to the natural flow of a stream running through or along his land in its accustomed channel, undiminished in quantity and unimpaired in quality, except as may be occasioned by the reasonable use of the water by other like proprietors." See cases cited.

Under the "Eminent Domain" chapter 33, *supra,* the municipalities of the State have a right, under a clear interpretation of the law, to acquire all necessary land and water rights by purchase or condemnation (paying just compensation) or otherwise, for the public use or benefit of such body politic.

This is the first time this question has been to this Court. It is of great importance to the municipalities and landowners of the State. It deals with property rights and health, and we have gone into the matter more extensively than usual.

We have gone carefully over the charge of the court below, and commend it for its fairness. The record shows that the charge was clear

and accurate, giving the law applicable to the facts in the case and the contentions of the parties. We have gone over the prayers for instructions and the other assignments of error, and can find no prejudicial or reversible error.

We have considered only the main and material assignments of error. No error.

STACY, J., dissents.