# Harris Chemical Company, to use, *v.* Tunnell & Company, Incorporated, Appellant.

*Contracts—Sales — Refusing to perform — Cancellation of con-
tract—Construction—Intention.*

In an action for the breach of an executory contract for the sale
of 300 tons of potash to be delivered f. o. b. cars shipper's works, in
carload lots of not less than fifteen tons as ordered by buyers,
brought by the buyer against the seller, it was provided "Buyers to
give the seller reasonable notice of all shipments wanted. Final
shipments under this contract to be completed by May 30, 1915,
and any balance unshipped on the latter date through failure of
buyers to furnish instructions, may, at the option of the sellers, be
either shipped on this contract or cancelled." By supplemental
contract dated May 21, 1915, the time for the delivery of the potash
was "extended until and completed by July 1, 1915, instead of
May 30, 1915, as given in the original contract." It appeared that
one month after the contract was made, defendant shipped to plain-
tiff fifteen tons of potash, that plaintiff never ordered further ship-
ment until June 30th following and none was meanwhile shipped.
On June 30th, plaintiff advised defendant that it had assigned the
contract to a third party. The representative of the assignee de-
livered notice of the assignment to defendant on the morning of

June 30th; and at four o'clock in the afternoon, the assignee and plaintiff made demand on defendant for the balance of the potash which was refused. It appeared from all the evidence that there was not left sufficient time between four o'clock and twelve o'clock midnight in which to make delivery of all the potash f. o. b. cars, shipper's works. The lower court submitted the case to the jury which found a verdict for plaintiff upon which judgment was entered. *Held,* that as defendant did not have sufficient time to make delivery of the entire balance of tons called for by the contract, before its expiration, the defendant was justified in cancelling the contract and the plaintiff was not entitled to recover, and judgment was reversed and entered for defendant.

Argued Jan. 15, 1918.    Appeal, No. 211, Jan. T., 1917, by defendant, from judgment of C. P. No. 4, Philadelphia Co., June T., 1915, No. 4810, on verdict for plaintiff, in case of Harris Chemical Company, to the use of Peters, White & Company, v. F. W. Tunnell & Co., Incorporated. Before BROWN, C. J., STEWART, MOSCHZISKER, FRAZER and WALLING, JJ. Reversed.

Assumpsit for breach of contract of sale. Before FINLETTER, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $5,766.63 and judgment thereon. Defendant appealed.

*Errors assigned* were in refusing to direct a verdict for defendant and in refusing to enter judgment for defendant n. o. v.

*John Arthur Brown,* with him *Henry P. Brown,* for appellant.—Appellant did not repudiate its contract or refuse to ship the balance of the potash: United Press Assn's v. National Newspapers Assn., 227 Fed. 193; Dingley v. Oler, 117 U. S. 490.

The letter of appellees dated June 30, 1915, requesting shipment of the balance of potash and for the first time giving shipping instructions kept the contract alive for the benefit of both parties thereto, irrespective of any

/

question of repudiation by appellant, and appellees were required to give the appellant shipping instructions and reasonable notice of all shipments wanted in accordance with the terms of the contract: Avery v. Bowden, 5 E. & B. 714; Reid v. Hoskins, 5 E. & B. 727; Frost v. Knight, L. R. 7 Ex. 111; Zuck & Henry v. McClure & Co., 98 Pa. 541; United Press Assn. v. National Newspaper Assn., 227 Fed. 193; Roehm v. Horst, 178 U. S. 1.

The first shipping instructions given appellant by either appellee were contained in the letter of June 30, 1915, delivered to appellant between 3:30 p. m. and 4 p. m. on June 30, 1915; appellees did not comply with the terms of the contract, it being impossible for appellant to ship the full 285 tons before July 1st: American Fire Insurance Co. v. Hazen, 110 Pa. 530; Muncy Boro. School District v. Commonwealth, 84 Pa. 464; Rankin v. Woodworth, 3 Penrose & Watts 48; Miller v. Phillips et al., 31 Pa. 218, 221; The Express Publishing Co. v. The Aldine Press, 126 Pa. 347; Hocking v. Hamilton, 158 Pa. 107; Pinkham v. Haynes, 103 Me. 112; Alwart Bros. Coal Co. v. Royal Colliery Co., 234 Fed. Rep. 20; Frankfurt-Barnett Co. v. William Prym Co., Ltd., 237 Fed. Rep. 21.

*John Weaver,* for appellee.

OPINION BY MR. JUSTICE STEWART, April 3, 1918:

The transaction out of which this controversy arises is evidenced by a written contract entered into March 29, 1915, under the terms of which the defendant company sold to the plaintiff company three hundred tons of muriate of potash of a certain refined quality at the price of $200 per ton, to be delivered f. o. b. Penna. R. R. shipper's works, Philadelphia, in carload lots of not less than fifteen tons, as ordered out by buyers. The contract contains the following provision "Buyers to give the seller reasonable notice of all shipments wanted. Final shipments under this contract to be completed by

May 30, 1915, and any balance unshipped on the latter date through failure of buyers to furnish instructions, may, at the option of the sellers, be either shipped on this contract or cancelled." By supplemental contract dated May 21, 1915, the time for delivery of the potash was "extended until and completed by July 1, 1915, instead of May 30, 1915, as given in the original contract." On April 30th following the execution of the original contract, defendant shipped, upon order of the plaintiff, fifteen tons of the amount sold. Plaintiff never ordered further shipment until June 30th following, and none was meanwhile shipped. On the date last mentioned plaintiff notified the defendant by writing that it had disposed of the remaining two hundred eighty-five tons which it had agreed to take under contract of March 29th and the extension of May 21st, and had assigned all its interest therein to Peters, White & Company. The writing thus concludes: "This will be handed to you by Mr. Ellis Jackson representing Peters, White & Company, who will make the necessary arrangements with you, either for shipping or for holding on storage for their account." This communication was delivered by Mr. Jackson on the morning of the 30th of June. Under same date, but not delivered until about four o'clock in the afternoon, this further communication was delivered to the defendant company, "Gentlemen: We learn from Mr. Ellis Jackson, the representative of Peters, White & Company, of New York, with considerable astonishment, that you have refused to recognize the assignment which we made to that firm of our contract with you, so far as the balance of 285 tons of muriate, under our contract of March 29, 1915, with you and the extension thereof, is concerned. We now notify you that in view of the fact that we have sold this product to Peters, White & Company, your refusal to deliver may result in a claim or suit against us for breach of contract and that if you persist in your refusal it is our intention to hold you to the repayment of any damage we may suffer

thereby.   In order that there may be no misunderstanding we now give you notice, in which Mr. Jackson representing Peters, White & Company joins, to ship the balance of this material, 285 tons in accordance with the terms of the contract to Peters, White & Company, New York City, New York, who will take up the sight draft with bill of lading and certificate of analysis attached, in accordance with the terms of that contract.   If you do not comply with this request we again call your attention to the fact that we will hold you strictly responsible for any loss that may accrue.   You may, of course, have any reasonable time in which to make the shipment." (Signed) Harris Chemical Company, by Edward J. Hasse, Treas., Ellis Jackson, Representing Peters, White & Company.   Under date of July 1, 1915, the defendant company replied to this communication as follows: Harris Chemical Company, Gentlemen:  Your letter of the 30th ult., which is also signed by Ellis Jackson representing Peters, White & Co., was received by us between 4:30 and 5 o'clock p. m. yesterday.   Under the terms of the contract dated March 29, 1915, and the supplement dated May 21, 1915, it is our privilege to cancel it in so far as it relates to any balance of muriate of potash unshipped by July 1st, because of the failure on your part to give us such notice as would reasonably enable us to ship by that date.   Your letter was the first notice received by us that you desired shipments to be made of the balance of 285 tons of muriate of potash, and it cannot be considered as 'reasonable notice of all shipments wanted' as provided in the contract.   We, therefore, exercise our option to cancel the contract for the balance of the 285 tons of muriate unshipped."   (Signed) F. W. Tunnell & Company, Inc.   The present action was brought 25th of August following, to recover from defendant $15,675, for alleged breach of contract, the plaintiff claiming this to be the difference between the contract price of the potash and the market price of the same at the time of the alleged breach, with interest

added.    The trial resulted in a verdict for plaintiff in the sum $5,765.33.    A motion was filed by defendant for a new trial,—since withdrawn—also for judgment non obstante on the whole record, which was refused, and judgment accordingly was entered on the verdict.    The appeal brings nothing before us for our consideration but the refusal of the court to sustain the defendant's fifth point which asked for binding instructions.

While the issue was single, namely, whether the plaintiff gave defendant reasonable notice of the shipment it wanted—the delivery of 285 tons of the potash remaining unshipped—this inquiry can be met only as some unascertained facts are first determined.    The first, and most important inquiry must be to ascertain just when the demand for shipment was made.    The plaintiff averred in its statement of claim filed, that on the morning of the 30th of June the use-plaintiffs notified the defendant company of the assignment, and demanded immediate shipment of 285 tons of muriate of potash, which the defendant refused to deliver; and that again during the afternoon of the 30th of June the use-plaintiff made another demand upon the defendant to deliver the said 285 tons which the defendant again refused to deliver. It seems to be conceded that plaintiff's right to demand shipment continued until the expiration of June 30th, at midnight, conditioned, however, that there was left sufficient time between the hour when the demand was made and midnight of the same day to reasonably admit of a fulfillment by defendant of its contract obligation, which was to deliver f. o. b. in cars upon the railroad sidings at its plant, 285 tons of muriate of potash consigned to the plaintiff.    In view of the second question, which is yet to be considered, the practicability of making this delivery in the time intervening between the demand and the close of the last hour of the day, the importance of fixing definitely when the demand was first made becomes apparent.    There was no disagreement as to the fact that in the afternoon of that day, between four and

five o'clock, a written demand for the shipment was made. Defendants insist that this was the first and only demand. In support of plaintiff's averment that the demand was made during the morning of the 30th, plaintiff called to the stand Mr. Ellis P. Jackson, who, as their representative in the transaction, had visited the defendant company at its place of business, to negotiate with respect to certain details, on the 29th as well as 30th of June. Whatever conversation occurred touching the shipment of the 285 tons, occurred between Jackson and one or other of defendant's firm. Upon Jackson's testimony, and that alone, plaintiff relied to show an order for shipment given during the morning of the 30th. How far this testimony fell short of the purpose for which it was offered may be seen in witness's answers upon cross-examination. He was asked this question—"Did you give shipping instructions on the morning of June 30th?" His answer was —"I was there prepared to give shipping instructions." The examination proceeded: "Q. Did you give shipping instructions on the morning of June 30th? A. Mr. Tunnell sort of turned me down so flatly that I didn't have a chance to give any. Q. You did not give any shipping instructions? A. I was there prepared to. I was their representative for that purpose. I could have a certified check there and paid for the whole stuff. Q. I asked whether or not you gave shipping instructions on the morning of June 30th? A. I didn't have a chance to give them. Q. Then you didn't give them? A. If I didn't have a chance to give them I did not give them. Q. I understand the first shipping instructions were given in the second letter of June 30th? A. Yes. Q. That was presented when? A. That was presented in the afternoon, I judge about half past three or four o'clock." Here we have express and repeated denials by the person, who, as claimed by the plaintiff, made the demand during the morning of the 30th for shipment, that during the conversation he made any such demands, and

the positive statement that the first demand was made by the letter which he said he delivered between three and four o'clock of the afternoon. There was not a particle of evidence outside the testimony of this witness in the whole case in support of the plaintiff's claim.

We come now to the second inquiry: Was it reasonably practicable for the defendant company between the time when it was served with the demand, about four o'clock on the afternoon of the 30th, to comply with the demand then made by having on board of cars at its sidings, ready to be shipped, 285 tons of potash? The words "reasonable notice" as they occur in the contract can admit of no other meaning than we have here given them. They can have no reference to anything but the time required to load the particular shipment demanded upon the cars at defendant's siding. The time required would manifestly depend on the size of each shipment; what would be reasonable time for shipment of fifteen tons would manifestly not be reasonable time for shipment of 285 tons. The surroundings of the parties at the time of making the contract, and the subject-matter of the contract, are always admissible to ascertain the intention and understanding of the parties, if the expression in the contract be in any measure disputed; these as said in Bole v. New Hampshire Fire Ins. Co., 159 Pa. 53, form a sort of context which may be resorted to if there is any question to aid in arriving at the meaning of the contract. As we read this contract it is entirely free from ambiguity, and can be read intelligently without recourse to extrenuous conditions. We derive from the language used, with respect to the mutual obligations assumed, a covenant on the part of the buyer to receive and pay for 300 tons of muriate of potash, at such times, previous to the first day of July, 1915, and in such manner as the buyer may direct, giving to the seller reasonable notice of the demand, to the end that the seller might have reasonable opportunity, in view of its appliances and facilities,—assumed to be such as are ordinarily in

use—to meet its covenant, which was to place f. o. b. on cars upon such railroad sidings as it had in its plant for shipping the potash ordered.  We see nothing in the contract to indicate that other facilities than those regularly employed by the seller in such cases, would have to be supplied to expedite the shipment of any order received.  The contention of the defendant is that notice of the demand for the shipment of 285 tons of potash, received at four o'clock on the afternoon of June 30th, did not afford reasonable time—within the meaning we have given these words—for the shipment to be made within the period fixed by the contract, and that its default in making the shipment is chargeable solely to the delay of plaintiff in giving notice of its demand for the shipment.  On the other hand, the plaintiff insists that the notice of the demand was given in ample time to admit of its shipment within the period.  With respect to this inquiry the burden rests on the plaintiff, since it is always for the plaintiff to show performance of the contract by himself when he seeks to recover for a breach of the other.  The case was so proceeded with, the plaintiff introducing the question.  He who seeks to compel performance by others must show his right to ask it by showing his own performance of all that is preliminary : Mint's App., 128 Pa. 163.  It is this principle that governs in cases where the action is for breach of contract. If the contract, as here, discloses prior conditions to be performed by the plaintiff and on which defendant's performance depended, there can be no recovery except as the plaintiff avers and proves performance on his part. The first witness interrogated on the subject was Frederick W. White, one of the partners in the use-plaintiff's firm.  On cross-examination he was asked this question: "I understand you to say that in your opinion it would be possible for Tunnell & Company, receiving notice to ship on June 30th, in the morning we will say, at the first visit at 10 o'clock to have shipped during the day of June 30th the 285 pounds of potash?  A. I do not know

what their facilities are." The cross-examination thus proceeded: "Q. I understand you to say that you are prepared to testify that Tunnell & Company, having received a notice of this kind, we will say on June 30th, could have delivered 285 tons of potash on June 30th? A. I think they testified that they made no efforts themselves to get the car. Q. I am asking you what you are prepared to testify to? A. I do not know what their facilities are. I have never been to their factory. I have testified that there are factories that could deliver a large quantity of muriate of potash in a few hours. Q. You are not familiar with the Tunnell Company's factory? A. I have never been in their factory. Q. You do not mean to tell us that Tunnell & Company would have been able to deliver after the receipt of the notice on June 30th the balance of 285 tons on June 30th? A. I just told you I have never been to their factory and I do not know what facilities they have. Q. You cannot give us any opinion on that point? A. I do not know anything about it." The next witness interrogated was Ellis Jackson. On cross-examination he testified as follows: "Q. Do I understand you to say that you think Tunnell & Company could have delivered 285 tons of potash shipped on cars on June 30th after the receipt of that notice between half past three and four o'clock? A. We shipped soda ash, which is the nearest thing to bicarbonate of potash that I know, which comes in 250-pound bags, and we have repeatedly shipped in one day's notice four hundred to five hundred ton. This is the same kind of stuff exactly, and if I had sold 285 tons of soda ash, and somebody called me on the 30th of June, I would have got off as much as I could, and if I didn't get it all off that day I would the next. It is the intent of these things it seems to me is the right sort of thing. Q. Do you think Tunnell & Company, I will repeat, could have prepared and shipped 285 tons of muriate of potash between half past three and four o'clock on June 30th at the close of the working day on that date? A. That is an

hour and a half. The Court. It is midnight of that day. The legal day is midnight. Q. We will say midnight. A. I have worked until away in the morning. For an hour and a half you could not do it. Q. From two-thirty to midnight? A. They could have gotten two hundred tons off by that time. Q. By midnight? A. Yes." This was the whole of the testimony offered by the plaintiffs on this branch of the case. Its insufficiency is seen at once. Neither witness professed any knowledge of the facilities of the defendant company. The answer of the witness last named seemed to imply an acknowledgment of the impracticability of making the shipment by midnight when he said: "If I had sold 285 tons of soda ash and somebody called me on the 30th of June, I would have got off as much as I could and if I didn't get it all off that day I would the next," overlooking and disregarding the fact that under this contract the defendant company was not obliged to put any of the potash on board the cars after midnight of the 30th, since the contract had then expired, and the parties had been left to their remedies. No more could the requirement of the contract have been met by loading a part of the shipment required than by loading none. We have no hesitancy in pronouncing as matter of law, viewing with greatest liberality the evidence offered by the plaintiff that it failed to show such performance of the obligation it assumed under the contract with respect to notice of its demand for shipment as entitled it to recover in this case. The court below should have so held. It was error, therefore, to refuse defendant's request for binding instructions.

The judgment is reversed and judgment is now entered for defendant.