## Eidemiller v. Keystone Coal and Coke Company.

*David Waldron, A. C. Snively, Carrol Caruthers, James L. Kennedy, P. K. Shaner* and *John R. Keister,* for plaintiff.

*Marker & Rial,* for defendant.

COPELAND, P. J., October 6, 1930.—This is an action of assumpsit brought on May 15, 1925, to recover the sum of $5000, with interest from April 30, 1923, upon a cause of action whereof the following are the gist and essential facts of the plaintiff's statement:

That O. T. Miller and Anna Miller, his wife, by agreement dated May 16, 1919, a copy of which is attached thereto and marked Exhibit A, granted and conveyed for the consideration therein mentioned unto the Jamison Coal and Coke Company, a corporation, its successors and assigns, a certain right of way not exceeding thirty feet in width for the removal and transportation of coal over and across the lands of the said O. T. Miller and Anna Miller, his wife; which said agreement, among other things, contained the following: "In consideration whereof the party of the second part agrees to pay or cause to be paid to the party of the first part the sum of $1.00, the receipt whereof is hereby acknowledged, and does further agree that the mine water which may flow from its mine in tract B as aforesaid shall be carried by a tile, or otherwise encased drain, if necessary, from the point at which the water leaves the said coal mine to a point below the spring on the tract of land of the parties of the first part, so as not to pollute the water in the said spring, the parties of the first part hereby granting to the party of the second part the right to enter in and upon their lands for the purpose of constructing and maintaining said drain."

That pursuant to the execution and delivery of said agreement the Jamison Coal and Coke Company entered into the possession of said right of way and

lands and made its mine opening, installed its equipment and laid its railroad tracks and tramways, and proceeded to operate over and along the same course for the purpose of transporting coal.

That Oliver T. Miller and Anna N. Miller, his wife, by deed dated July 9, 1919, and recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book Vol. 652, page 177, granted and conveyed to E. T. Miller and Eugenia A. Miller, his wife, the premises subject to the right of way of the Jamison Coal and Coke Company, and that the said E. T. Miller and Eugenia A. Miller, his wife, by deed dated May 25, 1921, and recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book Vol. 659, page 366, granted the same to J. P. Eidemiller, the plaintiff above named.

That the Jamison Coal and Coke Company, by deed dated February 1, 1922, recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book Vol. 720, page 1, granted and conveyed unto the Cardiff Coal Company all the Pittsburgh seam or vein of coal in and underlying the said tract of land, together with the mining rights and privileges as set forth in the said deed; and that the Cardiff Coal Company, by deed dated February 2, 1922, and recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book Vol. 719, page 1, granted and conveyed unto the Keystone Coal and Coke Company, the defendant above named, the Pittsburgh seam or vein of coal underlying the said tract of land, together with the mining rights and privileges of said deed.

That pursuant to the execution and delivery of the deed by the Cardiff Coal Company, the Keystone Coal and Coke Company, defendant above named, took possession of the right of way granted and conveyed by O. T. Miller and Anna Miller, his wife, to the Jamison Coal and Coke Company, by said agreement dated May 16, 1919, plaintiff's Exhibit A attached to the plaintiff's statement, as well as the mine opening equipment, railroad tracks, tramways thereon, and proceeded to operate cars for transportation of coal.

That the Keystone Coal and Coke Company, the defendant above named, in violation of the agreement, plaintiff's Exhibit A attached to the plaintiff's statement of claim, has not kept the covenants contained therein by constructing and maintaining a tile or encased drain from the point at which the water leaves the said coal mine to a point below the spring on the tract of land of the plaintiff, so as not to pollute the water in said spring, but has broken the same by willfully permitting the water from the said coal mine to flow into the spring on the tract of land of the plaintiff mentioned in said agreement, polluting the water thereof and permanently destroying the said spring.

An amended statement of claim was filed July 31, 1928, amending the sixth paragraph of the plaintiff's statement of claim, reiterating the complaint therein, and further stating that by reason of a breach or failure on the part of the defendant to keep the terms and conditions to be kept and performed in the agrement, marked Exhibit A, the plaintiff has lost tenants on his farm in the years of 1924 to 1928, the annual rental value being $1500; and that the concrete floor of the spring house, the pipe and water system in the spring house have been destroyed to the extent of $300, and that it would cost $500 to drill a well; and increasing the damages originally claimed in the plaintiff's statement of claim from $5000 to $10,000.

To the plaintiff's statement of claim an affidavit of defense was filed denying all the facts therein set forth and an amended affidavit of defense to the plaintiff's amended statement of claim, denying everything therein set forth and averring that the tile or encased drain was constructed according to the

terms and conditions of the agreement marked plaintiff's Exhibit A, attached to the plaintiff's statement of claim.

It can be readily seen that the gravamen of the plaintiff's statement of claim is, first, the failure to construct a tile or encased drain to carry the mine water which flows from this mine to a point below the spring on the plaintiff's tract of land; and, second, that by reason of the failure of Keystone Coal and Coke Company, the defendant, to construct this drain the spring was polluted by the water flowing from its mine.

Counsel for plaintiff has offered in evidence the first five paragraphs of the statement of claim which were not denied, and the deed of E. T. Miller and Eugenia Miller, his wife, to J. P. Eidemiller, the present plaintiff, which was dated, as we have already said, May 25, 1921, and recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book Vol. 659, page 366, which appears on page three of the testimony, giving the description of the land of the plaintiff and reservations as follows: "All that certain tract of land lying and situated in the Township of Salem, County of Westmoreland and State of Pennsylvania, bounded and described as follows: Beginning at a post at corner of lands of Isaac Lauffer and Mrs. Smith; thence by lands of Mrs. Smith, O. P. Smith and Paul Henry, North 12 degrees, West 125.4 perches to a post; thence by land of Paul Henry, North 86 degrees 30 minutes East 132 perches to a post; thence by land of which this was formerly a part, now David Miller, South 9 degrees East 126.4 perches to a post at land of Isaac Lauffer; thence by land of Isaac Lauffer, South 82 degrees 30 minutes West 6 perches to a post; thence by same, North 89 degrees 30 minutes West 50 perches to a post; thence by same, South 85 degrees 30 minutes West 70.2 perches to a post, the place of beginning. Containing 99 acres, 150 perches. Excepting and reserving however from the operation of this conveyance all the coal of the Pittsburgh vein or seam in and underlying the same, together with the right to mine, dig and carry away all of said coal and with all the mining rights and privileges necessary or convenient for mining the same and draining and ventilating the mines without being liable for any injury to the surface or to anything thereunder or thereon, by reason of the mining and removing of all of said coal and the draining and ventilating of the mines or the manufacture of said coal or other coal into coke at such places as may be now owned or hereafter purchased by the owners of said coal, their heirs and assigns. Together with the right of mining, removing and conveying under said described premises forever other coal and mine supplies belonging to or that may hereafter belong to the owners of said coal, their heirs and assigns. This conveyance is made subject to a certain right of way not to exceed thirty feet in width to a mine or coal opening that may be located to mine and take out the said Pittsburgh coal and the said right of way to be located on the North side of said farm and East of the buildings, together with sufficient surface for the opening and operating of the mine, not to exceed one acre of ground about the opening. The opening and right of way thereto to be at least one hundred yards from the farm buildings. Being the same right of way which was conveyed by Oliver T. Miller, et ux. to Sophia E. Rugh, et al., by deed dated June 15, 1914, recorded in Deed Book 548, page 82. Being the same tract of land which was conveyed to E. T. Miller, et ux., present grantors, by Oliver T. Miller, et ux., by deed dated July 9, 1919, recorded in the Recorder's Office of Westmoreland County, Pennsylvania, in Deed Book 652, page 177."

The burden was on the plaintiff to prove that a tile drain had not been constructed as provided in plaintiff's Exhibit A attached to the plaintiff's state-

ment of claim and to prove either that the water which polluted the spring came from the tile drain or, if none was constructed, that the pollution was caused by water flowing from the mine. The trial judge concluded that there was no evidence offered upon the part of the plaintiff showing the defendant had done something or had not done something in violation of the agreement upon which this action is founded, and he accordingly sustained the motion for a compulsory nonsuit with the right to move to take the same off within four days. On the following day the plaintiff, by his attorneys, moved the court to take off the nonsuit, assigning the following reasons:

"First. The primary intent and paramount object of the consideration to which plaintiff and his predecessors in title are and were entitled under the agreement of 16 May 1919, plaintiff's Exhibit No. 1, is the preservation of the spring from pollution.

"Second. The court erred in considering said agreement.

"Third. The court erred in holding that the defendant undertook only to construct a tile drain to take care of water which may flow from the mouth of the mine, whereas the undertaking was to prevent the pollution of the spring by water which 'leaves the said coal mine' externally or internally.

"Fourth. The court erred in rejecting various offers of testimony to prove by Oliver T. Miller and Anna N. Miller, parties to said agreement, as well as by other witnesses, facts and circumstances, the objects in view, the situation, surroundings, negotiations and conversation of the parties to the agreement, and the character of the consideration, for the purpose of clarifying and explaining the written language of the agreement.

"Fifth. The court erred in rejecting the testimony offered by plaintiff as to the statements made by James McDermott, the agent and representative of the coal company, party to the agreement, the inducements held out by said McDermott to said Millers, the entire negotiations between the parties upon behalf of said company having been carried on by said McDermott, and the defendant in this case adopting and receiving the benefits and advantages of said agreement."

All these reasons can be answered together, which we will now do in our discussion of this case, keeping in mind that a compulsory nonsuit is in the nature of a judgment for the defendant on demurrer to the evidence and that the plaintiff is entitled to the benefit of every inference of fact which might have been fairly drawn by the jury from the evidence.

The defendant's predecessors in title purchased the coal of the Pittsburgh vein or seam underlying the higher portion of the farm now owned by the plaintiff, together with the usual mining rights, including the right to bring therefrom by force of gravity upon the surface of the farm below the level of the said vein of coal mine water which might accumulate in the said mine by reason of said mining operations.

The plaintiff's predecessors in title purchased the said farm, excepting the coal and mining rights so as aforesaid purchased by the defendant's predecessors in title.

Afterward, to wit, on May 16, 1919, for a valuable consideration the defendant's predecessor in title contracted with the plaintiff's predecessors in title that "the mine water which may flow from the mine . . . shall be carried by tile or otherwise encased drain, if necessary, from the point to which the water leaves said coal mine to a point below the spring on the tract of land . . . so as not to pollute the water in the said spring."

It is undisputed that as early as 1922 the defendant had mined a portion of the coal underlying the plaintiff's farm and that by reason of such mining

operations sulphur water had accumulated in the mined-out area, and that such sulphur water by the force of gravity seeped through the earth and, therefore, mingled below the surface with the water which constituted the source of the spring mentioned in the contract, thus polluting the water supplied by said spring.

The defendant's Exhibit 1 is a map showing the boundaries of the plaintiff's farm, the location of the boundaries of the coal underlying a portion of his farm, the mining operations and the farm buildings, including the spring house in question. This map also shows an entry leading from the workings of the mine and the tile drain from below the mine. Although this map was not offered in evidence, it appears on page twenty-two of the testimony that it was agreed between the plaintiff and the defendant that it is a true and correct map of all that is shown on it. This exhibit was used in evidence in describing the various locations referred to in the testimony as to matters in dispute. It appears, as we have already said, that there was a tile drain leading from the mine and the figures on the map indicate that the low point in this mine was the point from which the tile drain was projected to the surface and below the line of the spring. This exhibit was shown to E. T. Miller, who, on page forty-eight, testified, on cross-examination, about a drain entry thus:

"Q. There is a drain entry there, isn't there? A. Where the tile is. Q. Were they to the right or to the left? A. As you would face it up the hill, it would be to the left. Q. There was water in there? A. There was water standing there. Q. The water that was gathered there just simply stood there? A. It seeped out through the ground. Q. You had a low place where the water would run out? A. There was a tile."

It also appears from the testimony of Mrs. Mary Eidemiller on page fifty-five that this water is a seepage which clearly comes through the ground by percolation and not by "flow." Her testimony is in part as follows, from page fifty-five:

"Q. You spoke about the water coming in the spring house—it comes out of the walls, does it not? A. It comes out of the wall and seeps into the ground. Q. Back of the wall of the spring house, that is, the wall against the hill, it is eight or ten feet high? A. About that. Q. When you get to the top of the wall at the outside, it is about level with the top of the ground? A. I don't know. Q. . . . The wall of the spring house up against the hill is cut down into the ground possibly seven or eight feet and the water comes down into the ground considerably under the surface of that soil which lies immediately above the spring house—isn't that correct? A. Yes; it comes down there, seeping through the ground, and comes into the spring house. Q. It is not apparent, except in wet sections on the surface above the spring house? A. There is no grass there; everything is dead; it must be coming out all the time. Q. There is a seepage all along the hill? A. Yes, sir. Q. It does not come out any place in a stream? A. No."

As we have already said, the plaintiff offered in evidence the deed from E. T. Miller and his wife to J. P. Eidemiller, wherein it appears that the coal is excepted and reserved, together with what are commonly known as complete mining rights; that is, there is a release of damages by reason of the mining and removing of all of said coal and draining and ventilating of the mines, which mining rights, of course, were modified by the agreement, plaintiff's Exhibit A, which was entered into between the Jamison Coal and Coke Company and O. T. Miller, plaintiff's predecessor in title, in so far as mining damages were concerned in this particular, "that the mine water which may

flow from the mine is to be carried by a tile or otherwise encased drain, if necessary, from the point at which the water leaves the said coal mine to a point below the spring on the tract of land." It clearly appears from the defendant's Exhibit 1, which we have already said was used by the plaintiff in his case, that the tile or encased drain was actually put in, and this is conceded by the plaintiff.

The action in this case is assumpsit for the breach of a specific covenant to build a tile or otherwise encased drain, if necessary, from the point at which the water leaves the said coal mine. The breach of the covenant has not been shown by the plaintiff in this case, but, on the contrary, it does conclusively appear from the testimony of Mrs. Mary Eidemiller that the destruction of · this spring was due not to the mine water which flowed from the mine and was carried by a tile drain below the spring and caused the pollution of the spring, but that the water came seeping through the strata as the result of coal operations due entirely to "seepage and not to flow."

Counsel for the plaintiff in their brief, under the caption of "Controlling facts proven and admitted" in subsections ten and eleven, assert that the defendant never in point of fact constructed a tile or otherwise encased drain to carry the water issuing from the mine. This assertion of fact proven or admitted is without the merest scintilla of evidence to support it; that conclusion, however, was drawn from the testimony of Bennett Keller, whose testimony on pages forty to forty-four, inclusive, is an incorrect conclusion, for the reason that the ditch spoken of in his testimony was along the side of the hill above the spring and had no connection whatever with the mine opening out of which the water flowed and the tile drain, but was an effort on the part of the defendant entirely outside of their agreement, plaintiff's Exhibit A, done gratuitously to keep the spring, if possible, from being polluted by seepage, as a reference to his testimony evidences, which we here quote from pages forty and forty-one:

"Q. From that time until you left in 1924, what was the character of the water? A. I was hired to ditch it, to stop it. Q. Why did you want to ditch it? A. So that they could prevent the sulphur water from coming into the good water. Q. Who was it that hired you to ditch it? A. The superintendent of the coal mine. Q. What coal company? A. The Keystone. Q. What was his name? A. Mr. Patton. Q. Did you dig a ditch? A. I did. Q. What effect did that ditch have on the water in the spring? A. It still had sulphur water in it. Q. Do you know when that ditching was done? A. I don't know exactly the date. Q. What year? A. 1923. Q. Was that ditching done after the spring was polluted or before? A. Well, the sulphur water had come in at that time and they ditched it after that. Q. Do we understand the spring was polluted before they ditched it? A. Yes, it was polluted before that. Q. Could you tell us about how long before you put the ditching in was it polluted? A. No, I could not tell the exact time; a year I suppose. Q. For what distance did you ditch? Did you do this ditching? A. I probably dug 100 feet of ditch anyhow. Q. You said it did not turn some of the sulphur water away from the spring. A. Yes, sir. Q. Did it turn all away? A. No, it did not turn it all. Q. Could you or not use the spring, or did they use the spring after the ditching was done. A. Not while I was there; I did not stay long afterwards." (Quoting from page forty-four.) "Q. You spoke about having put some ditches in there for Mr. Patton, the superintendent. Were those the ditches up there above the spring house where are some grape vines? A. Yes, sir. Q. That was cleared off right above the spring house? A. Yes, sir. Q. You say those ditches did not stop the water from coming in?

A. It stopped a certain amount of it; they had no tile in at the time I left there. Q. Didn't the water come seeping through the ground at that point? A. Yes, sir. Q. You could not get down to the bottom of it, could you? A. The coal lies a good deal higher than the spring. Q. There is a seepage of sulphur water the whole way around that hill? A. Yes, sir. Q. As I understand you, the ditch which you dug there was about 100 feet below the outcrop of the coal, right above the spring house? A. I dug it toward the grape vines and dug it toward the brow of the hill. Q. And that did not stop it from going into the spring? A. No."

There was no reason for counsel for the plaintiff, who happens to be another attorney than the ones who tried the case, drawing the conclusion from this testimony that no tile drain had ever been constructed. These drains were to prevent seepage and not a flow of mine water into the spring.

There is a clear line of distinction between "flow" and "seepage" in the same sense of percolating waters. All waters are in contemplation of law regarded as either flowing or seeping and percolating. Flowing waters consist of those bodies, such as lakes, ponds and streams, which are upon or beneath the surface of the earth, whose boundaries and courses are all defined and reasonably ascertainable and whose existence is not of a temporary or ephemeral character. All waters that seep and percolate are so regarded because practically they constitute themselves parts of the substance in which they exist or through which they pass. When found in land they may not be distinguished in law from the land: Hathorn v. Dr. Strong's Saratoga Sanitarium, 106 N. Y. Supp. 553.

In the case of Wheatley v. Baugh, 25 Pa. 528, the court said: "A mining company, in the course of necessary operations in mining minerals from their own land, interrupted the percolations which supplied a spring on an adjacent tract, and the owner of the spring, under the directions of the court below, recovered damages for the loss of it. The question is, can this recovery be sustained?"

At the conclusion of the case the court said: "The plaintiff below had therefore no cause of action, and the jury ought to have been so instructed."

Further along in the case, quoting from page 531, the court said: "But, to entitle a stream to the consideration of the law, it is certainly necessary that it be a *watercourse*, in the proper sense of the term. A spring gutter on the surface, is none the less a watercourse, although it is not equal in volume to a river. Small as it may be, if it have a clear and well defined channel, and a regular flow in that channel, it cannot be diverted to the injury of the proprietors below. . . . When filtrations are gathered into sufficient volume to have an appreciable value, and to flow in a clearly defined channel, it is generally possible to see it, and to avoid diverting it without serious detriment to the owner of the land through which it flows. But percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land."

In Haldeman v. Bruckhart, 45 Pa. 514, Mr. Justice Strong, delivering the opinion of the court, said: "In that case [Wheatley v. Baugh, 25 Pa. 528] it was ruled, that where a spring depends for its supply upon filtrations or percolations of water through the land of an owner above, and in the use of the land for mining or other lawful purposes the spring is destroyed, such owner is not liable for the damages thus caused to the proprietors of the spring, unless the injury was occasioned by malice or negligence. To such percolations or filtrations, then, the inferior owner has no right."

These cases have been quoted with approval in Collins v. Chartiers Valley Gas Co., 131 Pa. 143.

We, therefore, in this case, draw the distinction between water that is in the earth and finds its way through the soil by percolation or seepage and has not a defined flow in a stream and water which flows in a stream. In every authority upon this subject these distinctions are drawn and well recognized.

The only duty under the agreement resting on the defendant in this case is to see that the mine water which may flow from its mine shall be carried by a tile or otherwise encased drain, if necessary, from the point at which the water leaves the coal mine to a point below the spring, on the tract of land of the plaintiff, so as not to pollute the water in the said spring. There is no proof in this case that the defendant has not performed its part of the contract.

The first, second and third assignments to take off the compulsory nonsuit have been fully answered in what we have heretofore said in our discussion and are, as we view the case, without merit.

The fourth and fifth assignments complaining of the court rejecting various offers of testimony for the purpose of explaining the written language of the agreement and the conversations of a representative of Jamison Coal and Coke Company as to the agreement are likewise without merit, for the reason that there is nothing in the written agreement that is not plain and easily understood—that did not clearly express the contract between the parties.

The agreement between the parties is self-explanatory, and, so far as the conversations of the agent of the Jamison Coal and Coke Company and the other party to the agreement are concerned, is in contemplation of law merged into the written agreement. Then, again, there is no allegation in the plaintiff's statement of claim that there was fraud, accident or mistake in omitting anything that was previously talked about from the agreement or an allegation that there was a contemporaneous parol agreement or that there were any inducements held out to cause the Millers to enter into this agreement.

It needs no citation of authorities to hold that parol evidence is not admissible unless the agreement is ambiguous or unless more than one interpretation can be placed upon it, and to hold that prior conversations leading up to the agreement are in contemplation of the law merged in the written agreement.

Whenever parties to an agreement have put it in writing, it will be presumed that this was done because of the greater accuracy and certainty of the means of showing what the agreement was and in preserving the evidence of it. The writing thus becomes the expression of final result of the negotiations between the parties and is the best and only evidence of the transaction; all preliminary agreements and conversations being presumed to have been merged in such writing, and parol evidence to contradict or vary its terms is, therefore, inadmissible: Wodock v. Robinson, 148 Pa. 503; Murphey, to use, v. Greybill, 34 Pa. Superior Ct. 339.

When a contract has been reduced to writing, it is understood as expressing the final conclusions of the contracting parties and fully accepted as merging all prior negotiations and understandings, whether agreeing or inconsistent with it. To contradict or vary the terms of a written agreement by oral contemporaneous agreement between the parties there must be allegations as well as proof, not only of it, but of its omission through fraud, accident or mistake from the writing. The evidence of a contemporaneous parol agreement modifying the terms of a written agreement must, in order to prevail, be clear, precise and indubitable and must carry a clear conviction of its

truth and be sufficient in weight to move the conscience of a chancellor to reform the instrument: Pioso *v*. Bitzer, 209 Pa. 503; General Electric Co. *v*. Camden Iron Works, 239 Pa. 411; Lowry *v*. Roy, 238 Pa. 9.

This we think disposes of the fourth and fifth assignments, and being of the opinion that there is no merit in any of the assignments, a compulsory nonsuit was properly granted.

As our brother, Judge Whitten, suggests and clearly points out, leaving defendant's Exhibit 1 entirely out of consideration, then there is no testimony that the defendant constructed any entry or drain in order to permit the mine water to flow from the mine to the surface of the land. Moreover, it is undisputed that the sulphur water in the mine does not flow therefrom at any point in a stream.

When the contract dated May 16, 1919, was executed, the parties must have considered that the mining of the coal would probably cause sulphur water to accumulate in the mined-out area and that unless proper drainage were provided such mine water might flow into the spring, which was lower than the vein of coal. Did the parties to the contract, when the contract was executed, consider that the water which might accumulate in the mine would be carried therefrom to the surface of the ground by an entry or drain, and that the tile drain was provided only for the purpose of carrying such mine water from the point where a drain might lead the mine water in a stream from the mine to the surface of the ground?

Did the parties to the contract intend that the owner of the coal was obliged to construct a drain to carry the mine water in a stream from the mine to the surface of the ground? Or did they merely consider that the owner of the coal might or might not construct such a drain, and that if he did construct such a drain he must carry the water from the mouth of such drain by means of a tile drain to a point below the spring?

The language of the contract implies that the water which might accumulate in the mine would flow from the mine at a certain point, and that the mine water which was to be carried by the defendant in a tile drain was mine water which would flow from the mine at a certain point. By the terms of the contract, was the defendant required to construct an entry or drain for the purpose of discharging the water from the mine at a certain point?

Of course, the purpose of the contract dated May 16, 1919, was to save the spring, which was located below the level of the vein of coal, from pollution by sulphur water which might accumulate in the mine. However, the owner of the coal did not contract as an insurer to prevent such pollution, but the owner of the coal vein did contract to do certain things to prevent the pollution of the spring, namely, to carry "the water which may flow from the mine . . . from the point at which said mine water leaves said coal mine to a point below the spring."

From the testimony of Mrs. Mary Eidemiller, the wife of the plaintiff, on page fifty-five, heretofore quoted, it appears that the mine water which polluted the spring did not flow from the mine to the natural surface of the ground, but that it seeped through beneath the surface and mingled with the water which was the source of the spring.

The plaintiff in his statement of claim avers that the defendant violated the contract dated May 16, 1919, as follows: "Plaintiff avers that the said Keystone Coal and Coke Company, defendant above named, in violation of the provisions of the said agreement, dated the 16th day of May, 1919, copy of which is hereto attached and marked Exhibit 'A,' has not kept the covenants contained therein by constructing and maintaining a tile or encased

drain from the point at which the water leaves the said coal mine to a point below the spring on the tract of land of the plaintiff, so as not to pollute the water in the said spring, but has broken the same by willfully permitting the water from the said coal mine to flow into the spring on the tract of land of the plaintiff mentioned in said agreement, polluting the water thereof and permanently destroying the said spring and the waters thereof."

The plaintiff does not aver that under the terms of the contract the defendant was obliged to conduct the sulphur water of the mine to the surface and to discharge said mine water at a point where it could be carried in an enclosed tile drain to a point below the spring. In other words, the plaintiff does not aver that by the terms of the contract the defendant was required to carry the water from the mine to a point on the surface of the water by means of a drain or otherwise.

In Nimlet's Estate, 299 Pa. 359, the Supreme Court, speaking of the construction of contracts (quoting from page 365), said: "We have often decided that 'every agreement should be interpreted with reference to the circumstances under which the parties contract, and in the light of the objects to be accomplished:' McKeesport Machine Co. *v.* Ben Franklin Ins. Co., 173 Pa. 53; Myers's Estate, 238 Pa. 195, 211; Ruth-Hastings Glass Tube Co. *v.* Slattery, 266 Pa. 288, 291; Van Horn *v.* Kemena, 281 Pa. 579. 'An agreement is the assent of two minds to the same thing. It should be construed in the light of the existing facts and circumstances under which the parties entered into it. It should be so interpreted as to effect the objects in respect to which the parties proposed to contract:' Richardson *v.* Clements, 89 Pa. 503, 505; McMillin *v.* Titus, 222 Pa. 500, 503. 'The circumstances surrounding the parties when the contract was made, and affecting the subject to which it relates, form a sort of context that may properly be resorted to in doubtful cases to aid in arriving at the meaning of the contract:' Bole *v.* New Hampshire F. Ins. Co., 159 Pa. 53, 56; Harris Chemical Co. *v.* Tunnell & Co., 261 Pa. 72, 79."

If it was intended that the defendant should construct a drain or tunnel in the mine to carry all the sulphur water from the mine to a point on the surface of the farm, why did the contract not so provide? If the contract did not require the defendant to conduct all the water in the mine by drain or tunnel to the surface of the farm and if the mine water did not flow to a point or place on the surface of the farm but seeped underneath the surface of the ground and there mingled with the waters which were the source of the spring, it is not apparent that the defendant has violated the terms of the contract, as all the defendant company or its predecessors in title agreed was "that the mine water which may flow from its mine . . . shall be carried by a tile or otherwise encased drain, if necessary, from a point at which the water leaves the said coal mine to a point below the spring so as not to pollute the water in said spring."

There is no evidence in this case of any flow of water from the defendant's mine outside of defendant's Exhibit 1. There is positive evidence in this case that this spring has not been polluted from the flow of water from the mine but from percolation or seepage of the water from the mine, and, that being true, the plaintiff was not entitled to recover and a compulsory nonsuit was properly entered because the contract only provided that the flow of water from the mine would be taken care of.

And now, to wit, October 6, 1930, after argument and after due and careful consideration, Judges Copeland and Whitten concurring, it is ordered, adjudged and decreed that the motion to take off the compulsory nonsuit entered in this case be and the same is hereby refused.