Iotion granted.

---

Misc. Rep. 445.)

HORN et al. v. DR. STRONG'S SARATOGA SPRINGS SANITARIUM
et al.

(Supreme Court, Special Term, Saratoga County.   June, 1907.)

ATERS—PERCOLATING WATERS—DIVERSION.

Where mineral springs have a common source, and the owners of land n the neighborhood bore on the premises through the underlying rock ill they reach the mineral waters percolating therein, and attach thereto pump by which they divert by artificial appliances the mineral water rom plaintiff's spring, plaintiff is entitled to an injunction to restrain he defendants from operating their pump.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 113.]

AME—"PERCOLATING WATERS."

Underlying waters, whose sources are not well defined, are deemed percolating, and part of the land on which they are found, and the absolute property of the owner of the land, where he does not unreasonably injure the rights of others; and where he intercepts the percolating waters of his neighbor's land the injury is damnum absque injuria.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 108.

For other definitions, see Words and Phrases, vol. 6, p. 5287; vol. 8, p. 7750.]

ction by Emily H. Hathorn and Frank H. Hathorn against Dr. ig's Saratoga Springs Sanitarium and Sylvester E. Strong, to enpumping of a well.   Granted.

ockwood & Salisbury (Edgar T. Brackett, of counsel), for plain-

ohn A. T. Schwartz (Marcus T. Hun, of counsel), for defendants.

SPENCER, J. The plaintiffs are owners of the Hathorn mineral spring at Saratoga and the defendants of the Dr. Strong's Sanitarium in the same village. Plaintiffs' spring, discovered in 1868, has discharged large quantities of mineral water, which have been used for medicinal purposes upon the premises or conserved in bottles and sold for use elsewhere. Its owners have thus enjoyed a large and profitable business. In recent years the quality of gas has gradually depreciated and the flow of water decreased, so that, at the time of the commencement of this action, it had practically ceased to flow. The defendants, whose premises are about 1,200 feet distant, in 1902 drilled a well about 6 inches in diameter and about 400 feet deep, at which depth Saratoga mineral water was discovered. It did not come to the surface, but stood about 30 feet below. The defendants thereupon installed therein a steam rotary pump, with the plunger about 150 feet below the surface, and commenced its operation, and continued until this action and the service of an injunction order. Such order was subsequently modified, and continued as modified. Issue has been joined and a trial had. The testimony is voluminous. Counsel have submitted briefs remarkable for clearness and the orderly manner in which the evidence is collated. They have also discussed numerous decisions by courts of this and other countries. In the midst of such a wealth of citation and discussion, one is likely to be lost, unless elementary principles are kept in mind. These principles as to waters are simple. Therefore it will be well to briefly set them forth, in order to lead up to the particular questions involved.

In the absence of statutory regulations or private agreements, all waters are, in contemplation of law, regarded as either flowing or percolating. The former consists of those bodies, such as lakes, ponds, and streams, which are upon or beneath the surface of the earth, and whose boundaries and courses are well defined and reasonably ascertainable, and whose existence is not of a temporary or ephemeral character. As to these the owner of land has no title. His right to use or divert is measured by its reasonableness and limited to the premises along, through, or over which the waters flow. The reason for this rule is found in the fact that all such riparian owners have rights therein, and one may not unreasonably interfere with another. Without discussion, it may be premised that none of the waters of Saratoga belong to this class. All waters, not within the above description of flowing waters, are deemed percolating. They are so regarded because, practically, they constitute themselves parts of the substances in which they exist or through which they pass. When found in land, they may not be distinguished in law from the land. They are a part of the same, and the owner of the land is the absolute owner. He may use them where and in such manner as he chooses or dispose of them to others for like use. He is subject only to the general limitation, which has application to all ownership of property, that in its acquisition and enjoyment he may not unreasonably injure or interfere with the rights of others.

As all springs and streams classed as running waters draw their supplies from percolating waters, it follows of necessity that they are subject to diminution or exhaustion by use or diversion by the owner

of the land from which they come.  Pixley v. Clark, 35 N. Y. 520, 527, 91 Am. Dec. 72; Bloodgood v. Ayers, 108 N. Y. 400, 15 N. E. 433, 2 Am. St. Rep. 443.  Since the decision of Acton v. Blundell, 12 M. & W. 324, cited and followed by courts in our own country, it has been regarded also as settled law that the same rule applies to percolating waters in the lands of adjoining proprietors, and that one owner may dig and take all the percolating water he finds and use it to his own free will and pleasure; and if, by the exercise of such right, he intercepts or draws off the percolating waters of his neighbors' land, such injury is damnum absque injuria.  These decisions were made to rest upon the difficulties of determining with reasonable certainty the movements of percolating waters, and because adjudications in respect thereto would be against public policy as interfering with drainage, mining, and other public improvements.  But the researches of science have made plain and certain many things that were then beyond our knowledge, and it is difficult to perceive any relation which this subject has to public policy.  The rights of an owner in property below the surface should be regarded as inviolable as those in property upon the surface.

In the light of more recent decisions we must regard the foregoing cases as having application only to such percolating waters as pass from the lands of one owner to those of another by reason of natural laws, and not as applying to artificial appliances, employed to accelerate the operation of such laws or to divert, contrary thereto.  Thus, in Smith v. City of Brooklyn, 18 App. Div. 340, 46 N. Y. Supp. 141, affirmed 160 N. Y. 357, 54 N. E. 787, 45 L. R. A. 664, pumping percolating water from an excavation, by which surface ponds and streams on lands of a neighbor were depleted, was condemned as in violation of the rights of such neighbor.  In Forbell v. City of New York, 164 N. Y. 522, 58 N. E. 644, 51 L. R. A. 695, 79 Am. St. Rep. 666, affirming 47 App. Div. 371, 61 N. Y. Supp. 1005, the same doctrine was confirmed, and the pumping of percolating waters was restrained, because it drew percolating waters from a neighbor's land and thus depleted its moisture and rendered more difficult the cultivation of celery and watercress.  These cases must be regarded as making important advances in regard to this subject.  For example, in the latter it is said that the proof concerning underground percolating waters may be about as satisfactory and convincing as in the case of surface waters; and in the former the question of public policy is mentioned and disregarded.  They must also be regarded as decisive that the doctrine of reasonable use has no application to the rights of landowners in the percolating waters in their respective lands.  In the Forbell Case the water was employed by the defendant for the relief of suffering humanity in a great city and by the plaintiff to nourish celery and water cresses, yet the court prohibited the former for the sake of the latter.  Although not therein definitely stated, both of these decisions must be regarded as resting upon the proposition that the use of artificial means to attract or divert percolating waters is an unreasonable interference therewith, when shown to deplete such waters in the lands of another to his loss.

We thus come to the precise question in this case. Does the pumping at the defendants' well decrease the force of.the gas and the flow of water at plaintiffs' spring? If so, I find no escape from the conclusion that it is unjustifiable and should be restrained.

The question of fact which now confronts us has been sharply contested, and from the very nature of the case does not admit of ocular demonstration. The testimony discloses an instance between two other wells, where the effect was so direct and immediate as to be seen by complementary pulsations in pump and well; but no such direct relation could be expected between the spring of the plaintiffs and the well of the defendants, because of the distance between them and their different surface elevations.

In passing on this and on other questions of fact which may arise, I. shall not attempt any review of the evidence in support thereof, but simply indicate matters which have impressed and led me to my conclusions. Among the witnesses are a number, possessing world-wide fame as specialists in the departments of chemistry and geology, who have made the springs of Saratoga objects of special study, and whose opinions are entitled to the gravest consideration, as the topics upon which they speak are beyond the ordinary scope of judicial learning and observation. From this and the other testimony in the case, I am of the view that the evidence shows with reasonable certainty that all the mineral springs and wells of Saratoga have a common source, consisting of a stratum of mineral rock of comparatively limited area and located far down in the earth. We may, however, leave to the domain of speculation the question whether such stratum is the remains of an extinct volcano, as claimed by some, or a remnant of the ancient silurian ocean, as contended by others. Nevertheless, the fact of its existence is sufficiently demonstrated by its productions. The same may be said of the fact that surface waters percolate to this stratum; that chemical action takes place, forming gas; and that the latter impregnates the water and forces it to the surface by the easiest and most direct route. Men who have spoken concerning these things have not testified solely from what they have observed or discovered at Saratoga, but their knowledge is drawn from many experiences and observations.

Perhaps the most striking and interesting feature of the situation at Saratoga is the presence of a pre-glacial geological fault of great perpendicular displacement, but of small extent as compared with others. This has served as vent to the subterranean laboratory and been the occasion of all the springs that first made Saratoga famous as a health resort. In recent years artificial borings have been substituted; and now, few, if any, springs flow as of old. Much has been said of this fault, and attempts made to distinguish springs which exist by reason thereof from those which have been made by artificial borings; but I regard the matter of little consequence. As we have seen, the right to excavate on one's own land may not be questioned, although it serves by the laws of nature to deprive a neighboring landowner of his percoalting waters. The fact stands out in the proofs that the springs which come by way of the fault, as well as those which have been

formed by borings, are liable to changes, due to different causes, but primarily to the tendency of the outlets to become contracted or closed by obstacles and the formation of deposits thrown off by the waters. The history of the High Rock spring, as read from its successive strata of muck and calcareous limestone, affords a striking illustration. But this does not explain the general decrease in the force of gas and flow of water in all the springs during recent years; and, in order to determine that question, it will be necessary to briefly review the situation from the beginning.

The history of the springs divides itself into three periods. During the first, only few springs were known, and these found their way to the surface by means of the geological fault. In some instances, the natural vents were supplemented by adjacent borings; but no pumps were employed, except to dislodge temporary obstructions or to remove surface water, which occasionally found its way into the vents and by its weight held back the water charged with gas. It was during this period that the springs acquired their fame because of their medicinal virtues, and in consequence a considerable village, with large and expensive hotels, was built in their neighborhood, and multitudes resorted thither to partake of the healing waters. All these springs flowed by reason of their own gas pressure. Their flow was generous and substantially continuous. The plaintiffs' spring was among them; for, although it did not belong to the original number, it nevertheless reached the surface by means of the fault. The second period is marked by extensive borings of wells. The popularity of the waters created a great demand, not only at the springs, but throughout the country, and large quantities were bottled and sold for use elsewhere. This occasioned a quest for additional means of supply, and deep borings were resorted to. It was found that the mineral stratum lay along the east side of the fault, and that borings along that line pierced the stratum and relieved the gas and water. In this manner wells, producing great volumes of water and strong forces of gas, were produced. In some instances the water spouted to a height of 30 feet above the surface; and, in others, only gas was discharged. It seemed as if the supply was inexhaustible; and, in one case, a spouting spring was left to flow for spectacular effect alone. I think the evidence indicates that, during this period, there was a diminution observed in the force of gas and flow of water throughout the entire system. I cannot affirm, but it is probable, that, had such borings been continued and sufficiently increased in number, they might have exhausted the supply; but events were not permitted to take that course. The business of extracting gas from the water and compressing it into steel cylinders for market had then assumed large proportions and became profitable. The demand for larger supplies of water for this purpose called for another and more effectual force to bring the water to the surface than that of the gas itself. This demand brings us to the third and present period, which begins with the installation of powerful deep-well pumps in many of the wells and their ceaseless operation by steam power. That serious consequences would result should have been anticipated. I think the evidence leads to the conclusion that, since the general in-

auguration of pumps, there has been a marked and steady depreciation of gas pressure in all the springs and wells and a lessening of the flow of water, and that, in many instances, both have disappeared entirely; that, if such pumping be continued, it will result in the destruction of all the natural springs and wells—that is, all that flow by virtue of their gas pressure alone. It may be noted here that two methods of pumping are employed, one by the use of a plunger far down in the well, drawing the water thereto by a powerful suction and raising it to the surface, and the other by forcing gas far down into the earth, where it is released into the well and, by its lifting power, forces the water up. Both methods are equally fatal to wells and springs where no pumping takes place.

I think from this outline of the history of the springs, in connection with the teachings of the men of science who have been called, we may safely conclude that all the Saratoga mineral waters come from a common source and are held in the earth in a state of percolation, and that pumping upon one may seriously affect the force of gas and flow of water in another. Evidence in respect to instances where such results have been observed has been given; and what is true of these is, no doubt, true of all. The evidence touching the direct effect, by pumping at the defendants' well, upon the plaintiffs' spring, is not as conclusive as it might be; but I think it will support a finding that an effect is produced and that gas and water, which otherwise would go to the plaintiffs' spring, are diverted by the force of the pump to the well of the defendants. I cannot escape the conclusion that pumping at any one of the wells, which reaches the line of the mineral stratum producing the gas, operates by lessening the force of gas and flow of water in all other wells and springs which draw their supply from that stratum.

There seems to be room to distinguish the situation at Saratoga (with its combination of mineral stratum, percolating water, geological fault, and consequent gas, forcing water to the surface) from the ordinary instances where rights in and to percolating waters have been involved; but I shall not attempt it. I prefer to rest the decision upon the ground that the employment of pumps, by which percolating waters of one landowner are drawn to the land of another, is an unreasonable acquisition of such waters. As to percolating waters, they must be left to follow natural laws. Although excavations and deep-well borings are lawful, and any loss of water to one owner thereby is damnum absque injuria, such is not the case when the loss is due to the employment of artificial means, such as pumps. It may be assumed that the use of ordinary pumps in lifting water from a well, no matter how deep, will not constitute a breach of this rule, as in such a case there is no compulsion imposed on the water in adjoining lands. It goes thereto in obedience to natural laws, operating without the interposition of artificial means.

The plaintiffs in their complaint demand heavy damages, and there can be no question that their once valuable property and business have been largely deprived of value; but the defendants have, I think, been only a small, and, I am sure, unintentional, factor in bringing about

such results. Defendants made their boring without thought of securing mineral water or interfering with that of the plaintiffs. Yet, if their pumping constitutes an interference with the waters of the plaintiff, it is not within its rights. The fact that they have put the water to a more meritorious use than the defendants does not avail, for the doctrine of reasonable use has no application to percolating waters. The fact that they limit their use to the premises where their well is located, while the defendants in great part sell for use elsewhere, is also immaterial, for the reason that the owner of land and its percolating waters is not limited in his ownership. He may do what he will with his own. The fact that others have by their pumping caused greater injury to plaintiffs' spring makes the question of assessing damages practically impossible. The situation is one that does not call for charging one tort-feasor for the acts of all. Many other wells were pumped long before the defendants' was drilled. Defendants pumped only a short time before they were stayed by injunction. Furthermore, I do not regard the question of damages as important, and any attempt to partition them among all who are employed in pumping would be unsatisfactory and a mere guess. I think plaintiffs must be content in this action with nominal damages and judgment prohibiting defendants from the further use of pumps in their well which shall in any manner draw to their well any water that would not naturally percolate thereto, or divert from the land of the plaintiff any water that would naturally remain therein.

In view of the novel character of the questions involved, and that the main object sought by the plaintiffs is to rescue their spring from annihilation, the allowance of taxable costs is of small moment. I do not feel that it is a case where an extra allowance should be granted, as the defendants have acted in good faith and have been put to great expense on the trial. Therefore neither party is allowed costs as against the other.

Let findings of fact and conclusions of law be prepared, in accordance with the above, and submitted for signature.