## NASHVILLE, C. & ST. L. RY. v. RICKERT.

Middle Section.  September 7, 1935.

Petition for Certiorari denied by Supreme Court, January 25, 1936.

Ray Stuart, of Charlotte, and W. O. Hake and F. S. Hall, both of Dickson, for appellant.

Frank Slemons, of Nashville, and W. C. Cook, of Dickson, for appellee.

FAW, P. J.  A. G. Rickert, the defendant below, has appealed to this court from a decree of the chancery court of Dickson county granting a permanent injunction sought by the complainant railway in its bill.

The complainant railway is a common carrier operating one of its main lines of railroad through the town of Dickson, Tenn. Defendant Rickert is a resident citizen of Dickson county, Tenn.

On November 7, 1883, John Rickert, the father and predecessor in title of the defendant, for a valuable named consideration, transferred and conveyed to complainant railway, for a period of fifty years from that date, "the right to take all the water it may need for railroad purposes from a certain spring known as Rickert Spring situated," etc., "together with the right to care for said spring and the right of way to lay a pipe to convey the water to a reservoir or cistern near the proposed extension of Depot Street, also the right to construct such reservoir or cistern and erect an engine house, pump, fuel house and all necessary apparatus for operating a water station, together with the right of way to lay a pipe along the proposed extension of Depot Street to the track of the Nashville, Chattanooga and St. Louis Railway with right of way at all times for access to and from the spring, reservoir and pipes for the purpose of operating and repairing the same."

The instrument just mentioned was registered in the register's office of Dickson county in Book C, pp. 422, 423.

It was stipulated in said agreement that the railway should have the privilege of annulling same by giving six months' notice in writing of its intention to do so, and should also have the privilege, after giving such notice, to remove its pipe, buildings, pumping apparatus, and all the appurtenances belonging thereto.

On January 30, 1896, defendant A. G. Rickert (his wife joining), for a consideration of $1,500 cash in hand paid, bargained, sold, transferred and conveyed by deed to "J. W. Thomas, Agent, his heirs and assigns," a parcel of land particularly described in said deed, which description concluded with the words: "containing one acre and embracing a large spring known as Rickert Spring."

The spring thus conveyed was the same spring mentioned and described in the aforesaid instrument of November 7, 1883.

Said deed of January 30, 1896, contained further provisions as follows:

"The said A. G. Rickert and wife, Bena Rickert, for the above consideration also sell, bargain, transfer and convey to the said J. W. Thomas, agent, a right of way over his property for a proposed line of pipe to convey water from said spring to the N. C. & St. L. Ry. Said right of way for said line shall run as follows: Commencing at the spring and running along or under any part of the said proposed Spring Street between Rickert Avenue and the one acre to cross all streets and alleys now laid out or to be hereafter laid out. The said Spring Street above referred to is located 1264 feet east of Main Street measuring along Rickert.

Avenue and 1265 feet east of Main Street measuring along Cherry Street.

"The said A. G. Rickert and wife, Bena Rickert further agree to open up Spring Street as now laid out in a map shown to vendee and which runs from said spring lot herein conveyed to Rickert Avenue and perpendicular thereto and being fifty feet wide.

"They further agree never to build any house or other superstructure over said line of pipe. They further agree to allow the old line of pipe which now conveys water from said spring to the N. C. & St. L. Ry. to remain where it is uninterrupted until the new line of pipe is put in, at which time the old line of pipe over the property of said A. G. Rickert is to be taken up or abandoned. The old contract for water executed between John Rickert and the N. C. & St. L. and registered in the Register's Office of Dickson County Mortgage Book 'C', p. 422-423 is hereby annulled and cancelled.

"To have and to hold the said tract or parcel of land, with the appurtenances, estate, title and interest thereto belonging to the said J. W. Thomas, agent, his heirs and assigns forever. And we do covenant with the said J. W. Thomas, agent, that we are lawfully seized and possessed of said land in fee simple, have good right to convey it, and the same is unincumbered.

"And we do further covenant and bind ourselves, our heirs and representatives, to warrant and forever defend the title to said land to the said J. W. Thomas, agent, his heirs and assigns, against the lawful claims of all persons whomsoever."

It is stipulated of record that, at the time of said conveyance, J. W. Thomas was president of the Nashville, Chattanooga & St. Louis Railway; that he had no personal interest in said property; that the purchase was paid for by the railway; and that the property has been in the possession of the railway and used by it since the execution of said deed.

It is further stipulated as follows:

"That upon the death of said J. W. Thomas, Agent as aforesaid, his executors and heirs, J. W. Thomas, Jr., and Evalina Debow Thomas, conveyed said acre of land to the Tennessee Property Company, which conveyance was registered in the Register's office of Dickson County on May 24, 1906.

"That said Tennessee Property Company is a subsidiary corporation of The Nashville, Chattanooga and St. Louis Railway and it holds said property in trust for the use of said Railway. It is a mere dry trustee, and has never exercised any control over said property. The Railway has been in exclusive possession of same since the execution of the deed, copy of which is attached as an exhibit to the bill filed in this cause."

It is a reasonable inference from the recitals of the aforesaid

deed of January 30, 1896, in connection with the instrument of November 7, 1883, that the material inducement for the purchase by the railway of said one acre of land was to secure the permanent ownership and use of the spring thereon, known as "Rickert Spring," and this is fully confirmed by the proof in this case.

In the year of 1903, there was a "disturbance of the surface of the earth" on a parcel of land owned by defendant Rickert and at a point about one-quarter of a mile from complainant's said spring, which created a large funnel-shaped sinkhole about sixty feet deep and about twenty-five feet in diameter at the top, and seven or eight feet at the bottom.

It appeared, upon investigation, that about five hundred cubic yards of earth (estimated) had "slipped through a crevice something like eighteen inches wide," and had disappeared in a cave below which was filled with water up to the crevice. Efforts were subsequently made to ascertain the depth of the water in this cave, but, according to the proof, without success.

On October 8, 1931, the complainant railway filed the bill in this case and set forth therein, substantially, the facts we have stated. The complainant further alleged that it had erected a pumphouse and pumping apparatus on the said land bought by it from defendant, at a cost of more than $11,000, and that water was pumped from said spring thereon without interruption until about a month before the bill was filed; that there was a supply from said spring about sufficient for the water needs of complainant at Dickson; that about a month before complainant filed its bill in this case the defendant drilled a well at the point where the sinkhole had fallen in, and about September 8 (1931) defendant, having inserted a pump in the well, pumped out all the water that was available, and complainant's spring immediately went dry; that subsequently defendant again pumped out his well and again complainant's spring went dry; that on October 6, 1931, defendant again started his pump at his well and in about five hours complainant's spring went dry; and complainant charges that defendant's pumping caused the drying up of complainant's spring.

Complainant further alleges that it would not have purchased said property from defendant except to secure water from said spring and that defendant well knew this fact.

It is further alleged in the bill that the aforesaid experiments made by defendant in pumping water from his said well clearly demonstrates that there is a defined stream running from said well to said spring, and that complainant is advised that under the facts hereinbefore stated the defendant, in pumping the water from said well, is wrongfully interfering with the complainant's rights acquired by said deed, and that complainant will suffer irreparable injury if said well is operated by the defendant.

450

Complainant says further that defendant is intending to pump all the water from his said well, the effect of which will be to dry up complainant's spring and render it useless; that after defendant had bored said well, he called upon complainant with a proposition that it should pay him $100 a month to supply the water which would be necessary for complainant's uses if said spring is dried up, but that complainant could not accept the proposition without great loss, and could not safely intrust to others the regular supplying of water that is necessary to operate complainant's road and shops at Dickson; that complainant had taken the precaution to install duplicate pumping apparatus at said spring; and that this is the only "standby" that complainant has at that point.

Complainant further alleges that defendant does not intend to use the water from said well for domestic or farming purposes, but has in mind, as complainant is informed, supplying a bathing pool or disposing of said water to the city; that there is no residence or farming operations on the land surrounding said well.

Complainant prayed that an injunction issue restraining and enjoining the defendant from pumping the water from his said well to an extent that will diminish the flow of water at complainant's spring, and that at the hearing said injunction be made perpetual. Complainant also prayed for general relief.

On October 7, 1931, complainant's bill was presented to Chancellor Newman at Nashville, for a fiat, and he directed the clerk and master of the chancery court of Dickson county to file the bill in this case upon the execution of proper cost bond, and to notify the defendant that the application for the injunction prayed in the bill was set for hearing before Hon. J. W. Stout, chancellor, at 9 o'clock on Monday, October 26, 1931, at the courthouse in Charlotte, Tenn.

On October 9, 1931, complainant presented an amended and supplemental bill to Chancellor Stout, praying for an injunction, and Chancellor Stout granted a fiat directing that an injunction issue as prayed, on complainant giving bond and security in the penalty of $1,000 conditioned as required by law.

The amended and supplemental bill recited the filing of the original bill, the allegations and prayer thereof, and the aforesaid fiat of Chancellor Newman, and states that the defendant was served with process, and, along with the service of process, was notified by the clerk and master that hearing upon the application for an injunction would be had on October 26th at Charlotte.

Complainant then alleged that on "yesterday, October 8," defendant pumped the pool of water dry and the (complainant's) pumps went dry; that defendant ceased to pump "yesterday afternoon" and complainant's spring came back with a good flow by this morning, October 9th; that defendant is not using the water

he pumps for any purpose, but is pumping it out on the ground, and complainant charges that such pumping and waste is "done for the purpose of spiting complainant and depriving it of the use of the water without any profit whatever to any one"; that "the procedure of the defendant with reference to said water has resulted in a useless and unlawful deprivation of the rights of complainant"; and that "no sufficient remedy at law is available."

The allegations thus made in the original and amended bills are elaborated in the amended bill, but we think the foregoing is sufficient to indicate the cause of action presented by complainant's bill.

The defendant's answer to the bill is of considerable length—covering twelve pages of the transcript—and we will confine our statement thereof mainly to such parts as relate to matters that are material to the decision of the case.

Defendant says in his answer that his said deed (of January 30, 1896) did not convey or undertake to convey or grant any water rights, or any rights to use any water whatsoever, but says that it is true that on the one acre purchased by the complainant there was and is located a spring.

Defendant admits that some fifteen years ago and at a distance of over a quarter of a mile from complainant's spring there was an upheaval and sinking of his land that resulted in the formation of a large hole, extending into the earth for a depth of sixty feet, and that at the bottom of this hole there was water; but he "emphatically denies" that there is any connection between this water and the water of complainant's spring.

Defendant's answer contains, among others, admissions and allegations which we here quote as follows:

"It is true about a month ago the defendant sank a well near the place where the sinkhole had fallen, in fact within four (4) feet of the opening of the said sinkhole, and that he inserted herein a pump and pumped from said sinkhole several millions of gallons of water and that the effect of this pumping was to lower the water in the sinkhole some thirty-five feet (35) and then investigation and exploration was made of the said sinkhole, which resulted in the finding that this first pool of water was in a rock chamber, some twenty by twenty feet (20' by 20') round, and that leading off from it and lower than it was another immense chamber or cave filled with water, which after attaching another hose to the pump was pumped some fifteen (15) feet lower, and then measured and no bottom was ever found, so as to accurately determine the depth of this pool of water. The defendant shows to the court that the first chamber of water was twenty by twenty feet (20' by 20') after pumping some three or four feet out of it did materially reduce the flow of water at the complainant's spring he is informed, and that the water did not flow

in or out of the chamber or rock, there being no inlet or outlet perceivable, but same came into this upper chamber from the lower chamber, and that at least fifteen (15) feet of this twenty-foot (20′) chamber of water is lower on a level than the complainant's spring, and that below this twenty-foot chamber is an apparently inexhaustible supply of clear percolating water, no part of which even percolates to complainant's spring. It is true that after the water in the first chamber had been lowered some 2 or 3 feet that the defendant was informed that the flow of water at the said spring was diminished.''

Defendant denies that there was any understanding whatsoever between himself and complainant as to the use of said property deeded to complainant in 1896; but he says that he (defendant) knew, as alleged in complainant's original bill, that the railway company had secured water from the spring before, and presumed that they intended to use water from the spring after they purchased the acre of land.

Defendant alleges that the tests and experiments heretofore made, and partially completed, have demonstrated and conclusively shown that there is no defined stream running from defendant's well to complainant's spring, but that, on the contrary, the tests have shown that although the water in the sinkhole has been lowered 35 feet, that no channel, exit, or any indication whatsoever of a current exists in the rock chambers that could lead one to believe that this water flows in any well-defined channel, or any stream, from defendant's said reservoir; that from all indications this is a reservoir of percolating water, and defendant denies all allegations of the bill to the contrary.

Defendant says, in substance, that the statements in the bill as to the amount of water needed by complainant at Dickson are very much exaggerated, and that the total amount of water required by complainant at Dickson is 50,000 gallons a day. Defendant states that the tests thus far made have proved to him that he has a great abundance of water in said well, and because of this fact he now has contractors at work excavating on the property on which said well is located, for a large swimming pool, with a capacity of approximately three-quarters of a million gallons of water and which will be filled twice per week; that he is informed that he has a right to use his own water in this way, and that the residue of the water will be supplied to the citizens of the town of Dickson, through the city's water mains, and to the complainant, if it sees fit to use the same.

Defendant charges that complainant does not intend to use the water from its said spring for domestic or farming purposes, but is, and has been for near to half a century, pumping some 50,000 gallons a day for commercial uses in its own system, and has also

sold water to the town of Dickson and to contractors, and has permitted the rest to go to waste, and is now seeking to deny to defendant the use of the water from his own land in a manner similar to which the complainant has used the water from its spring during all these years.

Defendant states that the test shows that the well on his property will furnish an amount of fine, clear, fresh water in excess of 250,000 gallons per day.

Defendant denies the allegation in complainant's amended and supplemental bill that, on October 8, 1931, "he pumped the pool of water dry," or that he so stated. Defendant alleges that instead of pumping the pool dry, "the further said pool was lowered by said pumping the greater became the reservoir, and the supply of water percolating in said well, and that apparently and in fact, he has scarcely penetrated the great source of percolating water underlying his property."

Defendant denies that there is a known or well-defined channel from his well to complainant's spring, and he "insists that the complainant's actions in this matter are malicious."

Defendant further denies that any of his operations have been done "in a spirit of spite," as alleged in complainant's bill, or with the idea of injuring complainant, and defendant "insists that the pumping of his percolating water from the well which was sunk near the boundaries of his own land in good faith is not unreasonable use or such a useless waste as would sustain an injunction against the temporary pumping, notwithstanding that such pumping may temporarily decrease the supply of water in complainant's spring."

On October 27, 1931, defendant, by leave of the court, amended his answer so as to allege that the water is now standing in sight in the hole, or well, on his premises, and that this water is 56 feet below the surface of the ground, and that the elevation of said spring is only 58 feet below, or lower in height than the surface level at the site of his said sinkhole or well; that between complainant's spring and the water upon the defendant's property is property belonging to various and sundry individuals; that on the acre of ground of the railway company a small receptacle has been built about and around the spring, and no provision is made for storing this water at the spring, but that the railway company simply pumps its tank full, quits pumping, and permits the remaining water to go to waste; that complainant operates its pump at said spring "some in the morning and sometimes in the afternoon," and no pumping is done at night at all and the surplus water is allowed to run and waste; that the conveyance made by defendant to the railway company (on January 30, 1896) was not any more or less than a deed conveying one acre of land upon which a spring was located, and does not directly or by implication undertake to convey percolating water before it reaches the spring.

On October 27, 1931, the chancellor, on motion of defendant for a dissolution of the injunction theretofore granted, decreed that "said injunction be modified to the extent that the defendant be permitted to pump water from his s'aid well, on his own premises, in such amount and quantities as will not interfere or prevent the complainant from pumping the amount necessary to fill their said tanks or supply their said trains as heretofore."

In March and April, 1932, the complainant filed its proof in the form of depositions of a number of witnesses.

On February 3, 1934, the defendant (after due notice to complainant) again moved for a dissolution of the injunction, and, upon the hearing of said motion, the chancellor made an order as follows:

"This case came on to be further heard before Chancellor J. W. Stout, at Chambers, Clarksville, Tennessee, on a motion to dissolve an injunction heretofore granted against the defendant. After reading of the motion and argument of counsel the court is pleased and does modify said injunction so that the defendant or his agents or representatives may enter upon a thorough test of the water supply of the 'sinkhole.' But if and when the plaintiff's supply at their spring is diminished during said test so as to interfere with an adequate supply for their uses then unless the defendant or the town of Dickson has made provisions for sufficient and adequate amount of water for comp. use at their water tank at Dickson with no cost or expense to the comp. then and in that event this modification shall cease and the original injunction heretofore issued shall be in full force and effect. This test shall be completed within forty-five days from this date, February 3, 1934. And the cause is remanded to rules for taking proof which must be closed and filed within seventy-five days from this date.

"To which ruling the complainant Excepted.

"J. W. Stout, Chancellor."

In March, 1934 (after a motion by complainant "to compel a hearing" had been overruled and the cause remanded to the rules for further proof), the defendant took and filed the depositions of himself and other witnesses in his behalf.

On April 20, 1934, the depositions of two witnesses in rebuttal were taken and filed by complainant.

The cause was heard by the chancellor on April 25, 1934, and thereafter (on June 4, 1934) a final decree, which embraced the chancellor's findings of fact and conclusions of law, was entered as follows:

"This cause came on to be heard before the Honorable J. W. Stout, chancellor, holding chancery court of Dickson county, Tennessee, on the 25th day of April, 1934, upon the original and supplemental bills of injunction, the answer thereto, and all proof in the cause, brief and argument of counsel, and after consideration of all of which the court doth find the facts as follows:

" 'Where there is an underground flow of water so well defined as to be a constant stream, the owner of the land through which it flows has no right to divert to the injury of the person upon whose land it comes to the surface as a spring.'

"The court finds that for more than fifty years the complainant, N., C. & St. L. Railway, has operated its railway through the city of Dickson in Dickson county, Tennessee, that it has tanks for storage of water with which to operate its trains, and that some of said tanks are located at Dickson.

"The court further finds that there is an ever flowing spring on the land which was used by the complainant as lessee for the year 1883 to 1896. The court further finds that the defendant, A. G. Rickert, sold and conveyed by deed said spring and one acre of land upon which said spring is located to the complainant with the right to lay pipes through said land from said spring to said storage tanks within the town of Dickson; and that said deed was put of record as of January 30, 1896.

"The court further finds that complainant has been pumping water from said spring and supplying its trains constantly for a period of more than thirty years; that about a quarter of a mile south of complainant's spring the earth caved in about fifteen years ago and from which a sinkhole about sixty feet in depth, at the bottom of which hole is a cavern which serves as a reservoir into which water flows at the bottom, which fills the reservoir, and which water flows from said reservoir to complainant's spring.

"The court further finds the fact that the defendant, A. G. Rickert, put a pump in said sinkhole and said reservoir and pumped water therefrom on several occasions, and that on these occasions, complainant's spring ceased to flow, thereby demonstrating the certainty that said reservoir is the same stream which comes to the surface at and forms complainant's spring.

"The court finds it a further fact that on the occasions when the defendant, Rickert, pumped water from his sinkhole well complainant's spring ceased to flow and that it was necessary for complainant to get additional water from the town of Dickson in order to supply its ordinary needs for water to its trains, roundhouse and depot.

"The court further finds as a fact that the water which furnishes complainant's spring comes from the sinkhole reservoir on defendant's property, and that said water comes from the defendant's property to complainant's spring through an underground channel or stream, and that the temporary injunction was properly sued out by complainant, and that complainant has by the proof substantiated his right to have the injunction made perpetual.

"It is therefore ordered, adjudged and decreed by the court that

the temporary injunction heretofore issued be, and the same is, made a permanent and perpetual injunction to run with the land.

"That defendant, his agents, servants, assigns or persons holding under him, or any of, or either of them, are now and forever perpetually enjoined, prohibited and inhibited from pumping water from the sinkhole reservoir on the property owned by the defendant, A. G. Rickert, in such quantities and to such an extent as will interfere with or impair complainant's right to supply its trains and tanks from complainant's spring.

"The defendant, A. G. Rickert, will pay all costs of this cause for which let execution issue.

"To all of the foregoing findings of fact and decree of the court, the defendant, A. G. Rickert, through counsel, excepts and prays an appeal to the next term of the Court of Appeals, sitting at Nashville, and upon good cause shown the court is pleased to and doth grant said appeal and the defendant is allowed thirty days from this date to file his appeal bond in the sum of $250.00 and to otherwise perfect his appeal.  June 4, 1934.

"J. W. Stout, Chancellor."

The appellant perfected his appeal and has assigned errors, which assignments challenge seriatim the findings of fact, conclusions of law, and decree of the chancellor.

Upon a careful reading and consideration of all the evidence, we are of the opinion that it supports the facts found by the chancellor as set forth in his decree, and we concur therein.  The material and determinative facts are stated in the decree, and there is no occasion to restate them here, or to state and review the testimony of the several witnesses.

We are also of the opinion that, as stated by the chancellor, "Where there is an underground flow of water so well defined as to be a constant stream  .  .  .  the owner of the land through which it flows has no right to divert it to the injury of the person upon whose land it comes to the surface as a spring."

The fact that complainant's spring was an "ever flowing spring," furnishing complainant all the water it needed, prior to the time defendant placed a pump in the cave under his land, coupled with the *certainty* and *promptness* with which complainant's spring ceased to flow when defendant pumped water from his well continuously for a few hours, demonstrates the fact that there is a constant, underground flow of water from the cave under defendant's land to complainant's spring, notwithstanding the testimony of the witnesses for defendant who testified that they explored the cave with flashlights and discovered no opening or aperture in the sides of the cave through which the water could flow.

*In this respect,* the facts of the instant case are quite similar to the facts of the case of Gagnon v. French Lick Springs Hotel Co.,

163 Ind., 687, 698, 72 N. E., 849, 852, 68 L. R. A., 175, wherein the court said:

"It appears also from the evidence that the connection between the springs on appellee's land and the subterranean waters on the lands of the appellants is intimate and unmistakable, and that it has been demonstrated by actual experiment that an excessive flow of the waters on the lands of the latter, induced by artificial and unlawful means, exhausts the water, and entirely stops the flow of the springs on the land of the appellee."

We do not think that the right of the complainant to the relief granted by the chancellor depends necessarily upon proof that the water flows in a distinct and *well-defined channel* from defendant's cave to complainant's spring. "The proof concerning underground percolating waters may be about as satisfactory and convincing as in the case of surface waters." Hathorn v. Saratoga Springs Sanitarium, 55 Misc., 445, 106 N. Y. S., 553, 555; Forbell v. City of New York, 164 N. Y., 522, 58 N. E., 644, 646, 51 L. R. A., 695, 79 Am. St. Rep., 666.

The chancellor has applied to the facts of this case the rule known to American courts as the "reasonable use" doctrine.

According to the English or common-law rule, a landowner had the right to dig a well on his land and collect therein subterranean percolations which he might use as he pleased, even if he thereby destroyed the source of supply of wells or springs on the lands of others. This rule was followed in some early decisions in American states other than Tennessee, but the modern rule and "the better rule is that the rights of each owner being similar, and their enjoyment dependent on the action of other landowners, their right must be correlative and subject to the maxim that one must so use his own as not to injure another, so that each landowner is restricted to a reasonable exercise of his own rights and a reasonable use of his own property, in view of the similar rights of others."

"The doctrine thus enunciated has come to be known in the discussion of the topic as the 'American' or 'reasonable use' rule, and the general trend of recent decisions in many if not most of the states of the Union is in favor of such rule, and away from the English rule or common law doctrine of unqualified and absolute right of a landowner to intercept and draw from his land the percolating waters therein. In these later cases the right of a landowner to subterranean waters percolating through his own and his neighbor's lands, and which are a common source of supply for the lands of two or more of them, is limited to a reasonable and beneficial use of the waters upon the land or to some useful purpose connected with its occupation and enjoyment." 27 R. C. L., pp. 1171-1178.

Many cases on this subject are cited, and a number of the leading cases are reviewed, in the opinion of the Supreme Court of North

Carolina in the case of Rouse v. Kinston, 188 N. C., 1, 123 S. E., 482, 35 A. L. R., 1203; and we refer to that opinion for citation of authorities supporting the "reasonable use" doctrine.

The Supreme Court of New Hampshire seems to have been the first American court to depart from the doctrine of "absolute ownership" of percolating waters, and in a note to the California case of Katz v. Walkinshaw, 64 L. R. A., pages 236, 237, it is said:

"The New Hampshire doctrine is the only one which can be recognized by any courts purporting to be governed by principles of right and justice. The mere fact that the source and course of water which is found percolating beneath the surface of the ground are not known is no reason why the courts should refuse to apply to such water definite rules so far as it is possible to apply them, the same as to other species of property; and in actual practice the application of rules recognizing correlative rights and confining each landowner to a reasonable use of the water is not difficult."

In Cason v. Florida Power Co., 74 Fla., 1, 76 So., 535, 536, L. R. A., 1918A, 1034, 1037, the court said:

"The property rights relative to the passage of waters that naturally percolate through the land of one owner to and through the land of another owner are correlative; and each landowner is restricted to a reasonable use of his property as it affects subsurface waters passing to or from the land of another."

See, also, authorities digested in Annotation, 55 A. L. R., pages 1414-1416, supporting the statement that "under the American rule of 'reasonable use' a landowner may become liable for decreasing or destroying the flow of percolating water to a spring upon neighboring land."

The case of Tennessee Electric Power Co. v. Van Dodson, 14 Tenn. App., 54 (cited in defendant's brief), involved the obstruction or diversion of a subterranean stream flowing in a defined channel, and it was there held that there was no evidence upon which the jury could base a verdict that the defendant power company had obstructed or diverted the stream. The doctrine of "reasonable use" of percolating waters was not involved or discussed, and the only reference there to the law governing percolating waters was in a quotation from 40 Cyc., p. 629, which was manifestly quoted because of a statement therein of the law pertaining to "the obstruction or diversion of an underground stream flowing in a defined channel," and not for the purpose of laying down any rules of law governing percolating waters not involved in the case.

From an equitable viewpoint weight should be given, in the instant case, to the fact that defendant sold the acre of land, with the spring thereon, to the complainant, and defendant knew at the time he made said conveyance that the possession and use of the spring was the consideration which moved the complainant to buy

the land, and knew the character and extent of the use for which complainant wanted, and purposed to use, the spring. Cox v. Howell, 108 Tenn., 130, 144, 65 S. W., 868, 58 L. R. A., 487.

If complainant is deprived of the water of the spring, the very object for which it purchased the land from defendant is defeated. Wall v. Cloud, 3 Humph., 181, 184. In view of this fact, "We more readily conclude to affirm because the immunity from liability which the defendant claims violates our sense of justice." Forbell v. City of New York, supra.

It is apparent from the record that defendant can pump a considerable quantity of water from his "well" without materially reducing the flow of water from complainant's spring, and this he has a lawful right to do. The injunction goes no further than to enjoin and inhibit him from pumping water from the sinkhole reservoir on his property, "in such quantities and to such an extent as will interfere with or impair complainant's right to supply its trains and tanks from complainant's spring."

It results that the appellant's assignments of error are all overruled and the decree of the chancellor is affirmed.

The costs of the appeal will be adjudged against the appellant, A. G. Rickert.

Crownover and DeWitt, JJ., concur.